Joseph L. Reece
Eric J. Jenkins
DAVIS WRIGHT TREMAINE LLP
701 West 8th Avenue, Suite 800
Anchorage, Alaska 99501
Telephone:  (907) 257-5300
Facsimile:  (907) 257-5399

Attorneys for Plaintiff
Warner Bros. Domestic Television Distribution

UNITED STATES DISTRICT COURT

DISTRICT OF ALASKA

| | |
|---|---|
| WARNER BROS. DOMESTIC TELEVISION DISTRIBUTION, a division of WARNER BROS. TELEVISION DISTRIBUTION INC., a Delaware corporation,<br><br>          Plaintiff,<br><br>     vs.<br><br>FIREWEED COMMUNICATIONS CORPORATION, an Alaska corporation,<br><br>          Defendant. | Case No.  3:06-cv-00074-TMB<br><br>WARNER BROS. DOMESTIC TELEVISION DISTRIBUTION'S MOTION TO DISMISS DEFENDANT'S COUNTERCLAIMS |

## I.    INTRODUCTION

In May 2000 defendant Fireweed Communications Corporation ("Fireweed") entered into two license agreements with plaintiff Warner Bros. Domestic Television Distribution, a division of Warner Bros. Television Distribution Inc. ("WBDTD"), to broadcast reruns of "Friends" and "The Drew Carey Show" in the Anchorage market. WBDTD performed its obligations under those agreements and for several years

Davis Wright Tremaine LLP
LAW OFFICES
Suite 800 · 701 West 8th Avenue
Anchorage, Alaska 99501
(907) 257-5300 · Fax: (907) 257-5399

provided Fireweed with episodes of the two series for broadcast. Six years later, with its account substantially in arrears and after being sued for breach of contract, Fireweed has decided that the contracts were the product of coercion, that Fireweed owes nothing for the benefits it has accepted all of these years, and that WBDTD is guilty of everything from antitrust violations to unfair trade practices.

Fireweed's counterclaims are a transparent attempt to delay WBDTD's collection efforts. Indeed, Fireweed has not pleaded the basic facts necessary to state a valid claim for relief under any of the nine counts asserted in its Counterclaim. Even if all of the facts alleged by Fireweed were true – which they are not – all nine counts are subject to dismissal pursuant to Fed. R. Civ. P. 12(b)(6), and should be dismissed for at least the following reasons:

First, in its tying claims under federal and state law, Fireweed has failed to allege facts that demonstrate that the tie harmed competition in the relevant tied product market;

Second, Fireweed's federal and state law tying claims fail because WBDTD did not force Fireweed to purchase the tied product;

Third, in connection with the claim for restraint of trade (which claim Fireweed has only asserted under federal law), Fireweed has only complained about unilateral conduct, which is fatal to this claim;

**Davis Wright Tremaine LLP**
LAW OFFICES
Suite 800 · 701 West 8th Avenue
Anchorage, Alaska 99501
(907) 257-5300 · Fax: (907) 257-5399

Fourth, Fireweed has not alleged a restraint that is capable of harming competition in the relevant product market, yet another basis for dismissing the restraint of trade claim;

Fifth, Fireweed cannot state a claim for breach of contract because Fireweed has not alleged facts showing that making "Friends" and "The Drew Carey Show" available in Anchorage through other mediums was a breach of contract;

Sixth, Fireweed's unfair trade practices claims fail because California law does not regulate conduct occurring in Alaska, and Fireweed has not pleaded any facts that amount to a violation of either the California or Alaska unfair trade practices laws; and

Seventh, Fireweed's claims for tortious interference with prospective economic advantage fail because, as pleaded by Fireweed, these claims are dependent on Fireweed's antitrust and unfair trade practices claims, which claims fail as a matter of law.

## II.    FACTUAL ALLEGATIONS

As its name suggests, WBDTD distributes television programming, in particular syndicated television programming.  Counterclaims ¶ 2.[1]  On May 25, 2000, WBDTD entered into two agreements with Fireweed, which owns local television station KYES in Anchorage.  Pursuant to these agreements, WBDTD licensed to Fireweed the right to

---

[1] WB disputes many of the factual allegations contained in the Counterclaims; however, for purposes of this Rule 12(b)(6) motion only, it will assume that the facts alleged therein are true.  *Firoozye v. Earthlink Network*, 153 F. Supp.2d 1115, 1119 (N.D. Cal. 2001).

Davis Wright Tremaine LLP
LAW OFFICES
Suite 800 · 701 West 8th Avenue
Anchorage, Alaska 99501
(907) 257-5300 · Fax: (907) 257-5399

1  broadcast episodes of "The Drew Carey Show" (the "Drew Carey Agreement") and

2  "Friends" (the "Friends I Agreement") in the Anchorage market. *See* Appendices A-B

3  (attached hereto). WBDTD and Fireweed entered into a third agreement on May 20,

4  2002 in which Fireweed acquired the right to broadcast "Friends" for an additional period

5  of time (the "Friends II Agreement"). *See* Appendix C.[2]

6

7      During the negotiation of the Friends I and Drew Carey Agreements in 2000,

8  Fireweed informed WBDTD that it would enter into a license for "The Drew Carey

9  Show" if WBDTD would accept Fireweed's offer to acquire the broadcast rights to

10  "Friends" for the Anchorage market. In other words, as an incentive for WBDTD to

11  accept Fireweed's offer for "Friends," Fireweed made a contingent offer on license rights

12  for "The Drew Carey Show." Fireweed's offer is memorialized in Paragraph H of the

13  Drew Carey Agreement, which provides as follows: "It is understood and agreed that

14  this Agreement is contingent upon Warner's acceptance of [Fireweed's] offer dated May

15  25, 2000 relating to the licensing of the series currently entitled FRIENDS." Appendix

16  A. Contrary to the terms of Paragraph H, Fireweed now contends in its Counterclaims

17  that WBDTD forced Fireweed to take a license for "The Drew Carey Show" "as a

**Davis Wright Tremaine LLP**
LAW OFFICES
Suite 800 · 701 West 8ᵗʰ Avenue
Anchorage, Alaska 99501
(907) 257-5300 · Fax: (907) 257-5399

---

[2] Because the Counterclaims refer to the Drew Carey Agreement and the Friends I & II Agreements, *see, e.g.,* Counterclaims ¶¶ 4-6, 20, 25, 29, 31, consideration of the Agreements, which are appended to this Motion, does not convert the Motion into one for summary judgment. *Parrino v. FHP, Inc.*, 146 F.3d 699, 705-06 (9th Cir. 1998), *superseded by statute on other grounds as stated in Abrego Abrego v. The Dow Chem. Co.*, 443 F.3d 676 (9th Cir. 2006).

WARNER BROS. MOTION TO DISMISS DEFENDANT'S COUNTERCLAIMS - 4
ANC 89977v1 40529-5

condition of [WBDTD's] willingness to make a separate and distinct offer relating to the licensing of the Friends series to defendant."  Counterclaims ¶ 4.

After the parties entered into the Agreements, WBDTD allegedly violated their terms.  Fireweed contends that WBDTD breached the provisions granting Fireweed certain exclusive rights to "Friends" and "The Drew Carey Show" by licensing the shows for national exhibition on TBS Superstation.  *Id.* ¶¶ 29-31.  However, the Agreements state only that WBDTD may not license "Friends" or "The Drew Carey Show" for Local Origination Cablecasting within the Anchorage market.  Appendices A-C (Exhibit A to each of the Agreements ¶ 18).  Fireweed also contends that WBDTD violated Fireweed's exclusive rights by selling DVDs containing the programming, although Fireweed has not pointed to any provision of the Agreements that prevents WBDTD from selling the programming on DVD nor does any such term exist in the Agreements.  Counterclaims ¶¶ 32, 36, 40; Appendices A-C.  Finally, Fireweed makes a vague assertion that WBDTD billed Fireweed prior to making "additional episodes" available, which seems to be an allegation that WBDTD billed Fireweed prematurely during the term of one or more of the contracts.  Counterclaims ¶¶ 35, 39.

Fireweed also makes allegations about the WB 100+ Network that WBDTD supposedly developed to sell to cable stations in smaller markets.  *Id.* ¶ 7.  According to Fireweed, WBDTD obtained programming for the Network from another Warner Bros. entity (an entity that Fireweed identifies as Warner Bros. Syndication) and "various other

**Davis Wright Tremaine LLP**
LAW OFFICES
Suite 800 · 701 West 8th Avenue
Anchorage, Alaska 99501
(907) 257-5300 · Fax: (907) 257-5399

**Davis Wright Tremaine LLP**
LAW OFFICES
Suite 800 · 701 West 8ᵗʰ Avenue
Anchorage, Alaska 99501
(907) 257-5300 · Fax: (907) 257-5399

third party syndicators," even though WBDTD is "among the world's largest and most well-known distributors of syndicated television programming" and would not need to get programming from third parties.  *Id.* ¶¶ 2, 8.  The contracts for programming for the Network allegedly "contain[] exclusivity clauses that prevent[] third party syndicators from selling any of their syndicated television programming to broadcast stations in the markets smaller than the top 100 television markets, irrespective of whether the WB 100+ Network was present in those markets."  *Id.* ¶ 9; *see also id.* ¶¶ 11, 45-46, 49-53. Fireweed asserts that these exclusivity clauses prevented third-party syndicators from licensing programming to Fireweed, and somehow "forced" Fireweed to obtain "licenses for certain undesirable television programming" and to pay a premium for licenses for desirable programming.  *Id.* ¶¶ 9, 11, 13-14, 45-46, 49-53.[3]

In fact, as demonstrated by one of the contracts licensing programming to the WB 100+ Network (which contract is incorporated by reference into the Counterclaims), WBDTD does not procure content <u>for</u> the Network but rather sells programming <u>to</u> the Network.  Appendix D (example of a contract by which WBDTD licenses content to the WB 100+ Network).  Moreover, this contract does not contain the exclusivity clause alleged by Fireweed.  The contract does not prevent WBDTD from selling programming to anyone, but merely seeks to respect any exclusive rights to programming that may

---

[3] Fireweed appears to complain about the exclusivity clauses in the syndicators' contracts only during the period prior to July 2004 when no WB 100+ Network affiliate existed in Anchorage, and does not have any objection to the exclusivity clauses after an affiliate was established in Anchorage.  Counterclaims ¶¶ 10-11.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

**Davis Wright Tremaine LLP**
LAW OFFICES
Suite 800 · 701 West 8th Avenue
Anchorage, Alaska 99501
(907) 257-5300 · Fax: (907) 257-5399

have already been granted to the Network and/or other stations.  Appendix D (Exhibit

B).[4]

WBDTD now requests that the Court dismiss all of the Counterclaims pursuant to

Fed. R. Civ. P. 12(b)(6), and that the Court not grant Fireweed leave to amend because

Fireweed cannot construct legally cognizable claims against WBDTD.

### III.     ARGUMENT

If the allegations in a complaint would not entitle the plaintiff to any relief, either

because they lack "a cognizable legal theory" or do not contain "sufficient facts alleged

under a cognizable legal theory," then a court should grant the Rule 12(b)(6) motion and

dismiss the complaint.  *Balistreri v. Pacifica Police Dept.*, 901 F.2d 696, 699 (9th Cir.

1988); *see also Conley v. Gibson*, 355 U.S. 41, 45-46 (1957).

A plaintiff cannot evade a Rule 12(b)(6) motion simply by alleging legal

conclusions.  The deference accorded to factual allegations when deciding a Rule

12(b)(6) motion does not extend to its legal conclusions.  *Newport News Shipbuilding &*

*Dry Dock Co. v. Schauffler*, 303 U.S. 54, 57 (1938); *SmileCare Dental Group v. Delta*

---

[4] Exhibit B of the contract by which WB licensed "Sex and the City" to the Network states: "It is
understood and agreed that Licensor will retain the right to license the Program to a third party in any
television market listed below where Licensee does not have an affiliate in such television market.
Licensor will advise Licensee prior to doing so and will endeavor to make such license cancelable by
Licensor.  In the event that Licensor does so license the Program to a third party in one of the television
markets listed below and Licensee subsequently obtains an affiliate in that market then Licensee may not
allow the Program to be exhibited in that market unless and until Licensor has terminated with such third
party, if Licensor is able to do so."  Appendix D.

*Dental Plan of Cal., Inc.*, 88 F.3d 780, 785 n.6 (9th Cir. 1996).  For example, a plaintiff cannot satisfy its burden of pleading the essential elements of a "cognizable" antitrust claim merely by pleading antitrust magic words:  "'The pleader may not evade these requirements by merely alleging a bare legal conclusion; if the facts do not at least outline or adumbrate a violation of the Sherman Act, the plaintiffs will get nowhere merely by dressing them up in the language of antitrust.'"  *Rutman Wine Co. v. E. & J. Gallo Winery*, 829 F.2d 729, 736 (9th Cir. 1987) (quoting *Car Carriers v. Ford Motor Co.*, 745 F.2d 1101, 1106 (7th Cir. 1984)); *see also Les Shockley Racing, Inc. v. National Hot Rod Ass'n*, 884 F.2d 504, 508 (9th Cir. 1989) (claimant under Section 1 of the Sherman Antitrust Act "may not merely recite the bare legal conclusion that competition has been restrained unreasonably.  Rather, a claimant must, at a minimum, sketch the outline of the antitrust violation with allegations of supporting factual detail").  Rather than allowing a plaintiff with no reasonable likelihood of constructing an antitrust claim to force defendants to incur the "prohibitive" costs associated with discovery in antitrust cases, the court should grant a defendant's motion to dismiss, and not grant the plaintiff leave to amend his complaint.  *Rutman Wine*, 829 F.2d at 738.

Here, Fireweed has failed to allege either "a cognizable legal theory" or "sufficient facts alleged under a cognizable legal theory," making its Counterclaims ripe for dismissal.

**Davis Wright Tremaine LLP**
LAW OFFICES
Suite 800 · 701 West 8th Avenue
Anchorage, Alaska 99501
(907) 257-5300 · Fax: (907) 257-5399

**A.      Plaintiff Has Failed to State a Claim Under Federal Antitrust Law.**

Fireweed alleges that WBDTD violated Section 1 of the Sherman Antitrust Act and Section 3 of the Clayton Act, 15 U.S.C. §§ 1, 14, under two theories.  First, Fireweed contends that WBDTD engaged in illegal tying because it "tied" the license for "The Drew Carey Show" to the license for "Friends."  Counterclaims ¶¶ 2-6.  Second, Fireweed alleges that WBDTD has engaged in "an illegal attempt to monopolize and/or an illegal combination in restraint of trade" because the contracts for programming for the WB 100+ Network allegedly prevented syndicators from selling programming to Fireweed.  *Id.* ¶ 12.  Neither of these allegations state a claim and both should be promptly dismissed.

To plead an antitrust claim, the plaintiff must allege a restraint on competition that harms competition in a relevant market.  *See, e.g.*, *McGlinchy v. Shell Chem. Co.*, 845 F.2d 802, 811-13 (9th Cir. 1988) ("It is the impact upon competitive conditions in a definable market which distinguishes the antitrust violation from the ordinary business tort.  [The] failure to allege injury to competition is a proper ground for dismissal by judgment on the pleadings.").  Here, Fireweed has failed to allege a market that WBDTD is capable of harming or has harmed, a flaw that warrants the dismissal of all of its federal antitrust claims.  Moreover, Fireweed has not even alleged that WBDTD engaged in the requisite wrongful conduct:  taken as a whole, the pleadings demonstrate that WBDTD did not tie "The Drew Carey Show" and "Friends" or force Fireweed to license

**Davis Wright Tremaine LLP**
LAW OFFICES
Suite 800 · 701 West 8th Avenue
Anchorage, Alaska 99501
(907) 257-5300 · Fax: (907) 257-5399

programming it did not want; and the pleadings demonstrate that WBDTD neither

conspired to harm broadcasters nor does it control to whom other syndicators license

programming.  Because WBDTD did not engage in conduct that theoretically could harm

competition, the Court should dismiss Fireweed's federal antitrust claims.

### 1.    Fireweed Has Failed to State A Tying Claim.

A tying arrangement exists where a seller sells one product (the "tying product")

only on condition that the buyer also purchases a separate product (the "tied" product).

*Jefferson Parish Hosp. Dist. No. 2 v. Hyde*, 466 U.S. 2, 12 (1984); *Murphy v. Business

Cards Tomorrow, Inc.*, 854 F.2d 1202, 1204 n.1 (9th Cir. 1988), *overruled on other

grounds by Townsend v. Holman Consulting Corp.*, 929 F.2d 1358, 1363 (9th Cir. 1990).[5]

However, not all ties are illegal.  As the Supreme Court recently recognized, "[m]any

tying arrangements, even those involving patents and requirements ties, are fully

consistent with a free, competitive market."  *Illinois Tool Works Inc. v Independent Ink,

Inc.*, __ U.S. __, 126 S. Ct. 1281, 1292 (2006).  The Supreme Court's explanation of the

theory behind tying claims demonstrates why many ties are not problematic:

---

[5]  Fireweed has brought its tying claim under Section 1 of the Sherman Antitrust Act and Section 3 of the Clayton Act, 15 U.S.C. §§ 1, 14.  *See* Counterclaims, Count I.  There is a single standard for judging tying claims under both statutes, so Fireweed's tying claims under these statutes warrant dismissal for the same reasons.  *See Airweld, Inc. v. Airco, Inc.*, 742 F.2d 1184, 1189 n.2 (9th Cir. 1984).  Fireweed's claims under Section 3 of the Clayton Act should be dismissed for the additional reason that Section 3 only applies to "goods, wares, merchandise, supplies or other commodities," and not intangible items like the licenses for syndicated programming at issue here.  *See, e.g., Tele Atlas N.V. v. Navteq Corp.*, 397 F. Supp.2d 1184, 1192-93 (N.D. Cal. 2005) (tying allegation relating to a patent license does not fall within Section 3 because a license is not a tangible good); *Satellite T Ass'n v. Continental Cablevision of VA, Inc.*, 586 F. Supp. 973, 975 (E.D. Va. 1982), *aff'd* 714 F.2d 351 (4th Cir. 1983).

Davis Wright Tremaine LLP

LAW OFFICES
Suite 800 · 701 West 8th Avenue
Anchorage, Alaska 99501
(907) 257-5300 · Fax: (907) 257-5399

> [T]he essential characteristic of an invalid tying arrangement lies in the seller's exploitation of its control over the tying product to force the buyer into the purchase of a tied product that the buyer either did not want at all, or might have preferred to purchase elsewhere on different terms.  When such "forcing" is present, competition on the merits in the market for the tied item is restrained . . . .
>
> Accordingly, we have condemned tying arrangements when the seller has some special ability – usually called "market power" – to force a purchaser to do something that he would not do in a competitive market.

*Jefferson Parish*, 466 U.S. at 13-14.

In other words, an illegal tying arrangement exists when the seller forces buyers to purchase the tied product as a condition for obtaining the tying product, and this forced sale harms competition in the market for the tied product.  Here, Fireweed has not made allegations sufficient to show the requisite harm in the tied product market, warranting dismissal of the tying claim.  Indeed, Fireweed has not adequately pleaded the fundamental element of all tying claims, namely, that the defendant <u>forced</u> the plaintiff to acquire a product it did not want, a second basis for dismissing Fireweed's tying claim on the pleadings.

### a.    The Alleged Tie Is Not Capable of Causing the Requisite Harm to Competition in the Tied Product Market.

Plaintiffs may prove harm to competition in the market for the tied product in two ways.  If the plaintiff can show that the defendant has sufficient market power in the tying product market to make it likely that the defendant could have forced buyers to

Davis Wright Tremaine LLP
LAW OFFICES
Suite 800 · 701 West 8ᵗʰ Avenue
Anchorage, Alaska 99501
(907) 257-5300 · Fax: (907) 257-5399

Davis Wright Tremaine LLP
LAW OFFICES
Suite 800 · 701 West 8ᵗʰ Avenue
Anchorage, Alaska 99501
(907) 257-5300 · Fax: (907) 257-5399

purchase the tied product, then the "per se" standard applies.  Under per se analysis, competitive harm in the tied product market is presumed so long as the tie affected a "'not insubstantial' amount of interstate commerce" in the market for the tied product. *Northern Pac. Ry. v. United States*, 356 U.S. 1, 6 (1958) (quoting *International Salt Co. v. United States*, 332 U.S. 392 (1947)); *see also Jefferson Parish*, 466 U.S. at 13-14; *Mozart Co. v. Mercedes-Benz of N. Am., Inc.*, 833 F.2d 1342, 1345 (9th Cir. 1987); *Robert's Waikiki U-Drive, Inc. v. Budget Rent-A-Car Sys., Inc.*, 732 F.2d 1403, 1407 (9th Cir. 1984).  In contrast, if the plaintiff fails to prove that the defendant has enough market power in the tying product market to make forcing likely, then the "rule of reason" analysis applies.  Under the rule of reason, the plaintiff must prove, after a consideration of all economic factors, that the alleged tie actually reduced competition in the market for the tied product.  *See Business Elec. Corp. v. Sharp Elec. Corp.*, 485 U.S. 717, 723 (1988); *Jefferson Parish*, 466 U.S. at 18, 29; *Robert's Waikiki U-Drive, Inc.*, 732 F.2d at 1408.

The tying arrangement that Fireweed has alleged must be analyzed under the rule of reason because WBDTD does not have the requisite market power to trigger per se analysis.  Because the rule of reason applies, Fireweed must have alleged sufficient facts to demonstrate actual harm to competition in the market in which "The Drew Carey Show" competes, yet it has not done so, warranting dismissal of its tying claim.  And even if the per se rule applied (which it does not), Fireweed's allegations do not

demonstrate that the alleged tie affected a not insubstantial amount of competition in the market containing "The Drew Carey Show," further confirming that dismissal of the tying claim is appropriate.

### (1)     The Rule of Reason, not Per Se Analysis, Applies to Fireweed's Tying Claim.

Fireweed's Counterclaims fail to allege that WBDTD has the kind of market power in the market for the tying product that would make coercion likely and would justify treating the alleged tie as per se illegal. The conclusion that WBDTD lacks market power turns on the definition of the tying product market. Generally speaking, a relevant product market contains all products that are reasonable substitutes for one another, i.e., other products to which purchasers might turn in the face of a price increase. *See, e.g., Rebel Oil Co. v. Atlantic Richfield Co.*, 51 F.3d 1421, 1434 (9th Cir. 1995). Fireweed does not explicitly identify the relevant product market, but the Counterclaims indicate that Fireweed will either argue that the copyright protection accorded to "Friends" is sufficient to give WBDTD power in some undefined market, or that "Friends" constitutes its own market, so that possessing the right to license "Friends" gives the licensor control over 100% of the relevant market. However, as a matter of law the court must conclude that (1) no presumption of market power arises simply because the product at issue is protected by copyright law; (2) the relevant product market for the tying product consists of all syndicated television programming, not just "Friends"; and

**Davis Wright Tremaine LLP**
LAW OFFICES
Suite 800 · 701 West 8th Avenue
Anchorage, Alaska 99501
(907) 257-5300 · Fax: (907) 257-5399

(3) therefore Fireweed has not alleged (and cannot allege) facts sufficient to show that WBDTD possesses market power in a properly defined market.

According to Fireweed, "Friends" "possesses sufficient copyright desirability to confer on [WBDTD] sufficient market power to inflict the undesirable Drew Carey Show on [Fireweed]." Counterclaims ¶ 3. Fireweed's reliance on the copyright protection accorded to "Friends" to prove market power is legally untenable. Just this term, the United States Supreme Court rejected the argument that intellectual property protection necessarily confers market power. *Illinois Tool Works Inc.*, 126 S. Ct. at 1292-93. To the contrary, "in all cases involving a tying arrangement, <u>the plaintiff must prove that the defendant has market power in the tying product</u>." *Id.* at 1293 (emphasis added). Thus, the Court held that there is no presumption that patents confer market power. *Id.* at 1291.

Even before the Supreme Court issued the *Illinois Tool* decision, the federal antitrust enforcement agencies had already decided not to presume that intellectual property rights, including copyrights, give market power to those that possess them. The guidelines that the Department of Justice and Federal Trade Commission use when considering whether to bring an enforcement action state that "[t]he Agencies will not presume that a patent, copyright, or trade secret necessarily confers market power upon its owner." ANTITRUST GUIDELINES FOR THE LICENSING OF INTELLECTUAL PROPERTY § 5.3, *quoted in Illinois Tool*, 126 S. Ct. at 1292; *id.* § 2.0 ("Intellectual property rights in themselves do not necessarily give rise to a presumption of market power in the antitrust

Davis Wright Tremaine LLP
LAW OFFICES
Suite 800 · 701 West 8th Avenue
Anchorage, Alaska 99501
(907) 257-5300 · Fax: (907) 257-5399

context."); s*ee also Mozart Co.*, 833 F.2d at 1346-47 & n.4 (franchisor's trademark in Mercedes-brand cars cannot be presumed to have given the defendant market power in market for automobile dealership franchises).

Thus, Fireweed cannot rely on the fact that "Friends" is protected by copyright to prove that WBDTD possesses market power. Rather, Fireweed must define the relevant product market and prove that WBDTD holds power within this market. It defies common sense to place each syndicated television show in its own product market; syndicated television programming is essentially fungible. If a licensor were to raise the price for a show too high, stations would fill their programming slots with other, less expensive shows. No station <u>must</u> have "Friends" or any other show. *See Tarrant Serv. Agency, Inc. v. American Standard, Inc.*, 12 F.3d 609, 614-15 (6th Cir. 1993) (only in exceptional circumstances, such as where a product is unique and no reasonable substitutes exists, will a single brand of product reside in its own relevant market); *International Logistics Group, Ltd. v. Chrysler Corp.*, 884 F.2d 904, 908-09 (6th Cir. 1989) (same).[6] Therefore, the court should hold as a matter of law that the relevant tying product market consists of all syndicated television programming.

Davis Wright Tremaine LLP
LAW OFFICES
Suite 800 · 701 West 8th Avenue
Anchorage, Alaska 99501
(907) 257-5300 · Fax: (907) 257-5399

---

[6] The relevant market also has a geographic scope; at some point purchasers are not willing to travel further to obtain substitute products. However, there is not a geographical limitation to the market for syndicated television programming. If a syndicator raised its price for programming above the market rate, television stations could respond to such a price increase by purchasing substitute programming from anywhere given the ease with which programming is transmitted electronically or shipped on tape or disc, meaning that relevant geographic market is throughout the U.S. (or world).

Because the relevant product market includes all syndicated television programming, Fireweed's allegations do not suffice to prove that WBDTD has power within this market. Generally, a supplier has to have at least 30% market share to possess sufficient market power to enforce a tying arrangement. *Jefferson Parish*, 466 U.S. at 26-27; 1 Sher, ANTITRUST ADVISER § 2.38 at 2-94 (4th ed. 1995). Here, Fireweed has utterly failed to allege what percentage of the syndicated television programming market "Friends" commands. Fireweed only asserts that WBDTD is "among the world's largest and most well-known distributors of syndicated television programming for broadcast on television." Counterclaims ¶ 2. This is not enough to prevent the Court from holding that control of syndication rights to "Friends" does not give WBDTD market power in the syndicated television programming market, and that this case should therefore be judged under the rule of reason.

**(2)      Fireweed's Allegations Do Not Demonstrate That the Alleged Tie Had the Requisite Effect on Commerce in the Tied Product Market.**

Under the rule of reason, Fireweed must allege facts capable of showing, after a consideration of all economic factors, that the tie actually reduced competition in the market for the tied product. *See Jefferson Parish*, 466 U.S. at 18, 29; *Robert's Waikiki U-Drive, Inc.*, 732 F.2d at 1408. Fireweed has not even defined the tied product market, much less alleged facts sufficient to show foreclosure of competition in this market, the percentage of competition in the tied product market that has been foreclosed by the

**Davis Wright Tremaine LLP**
LAW OFFICES
Suite 800 · 701 West 8th Avenue
Anchorage, Alaska 99501
(907) 257-5300 · Fax: (907) 257-5399

alleged tie, or what dollar amount of sales have been affected.[7]  Nor has Fireweed alleged that WBDTD imposed the tie on any other stations; an allegation that the supposed tie harmed only Fireweed does not demonstrate harm to competition.  *Jefferson Parish*, 466 U.S. at 16 ("If only a single purchaser were 'forced' with respect to the purchase of a tied item, the resultant impact on competition would not be sufficient to warrant the concern of antitrust law."); *Robert's Waikiki U-Drive, Inc.*, 732 F.2d at 1408 ("To succeed on a rule of reason claim, an antitrust plaintiff must prove that the restraint in question injures competition in the relevant market. . . . . [I]njury to the antitrust plaintiff alone is not sufficient to prove injury to competition.").  Furthermore, Fireweed has not alleged that it would have purchased programming from WBDTD's competitors but for the tie.  If Fireweed did not forego the purchase of programming from other syndicators, then there is no harm to competition because competitors did not lose sales.  *See Jefferson Parish*, 466 U.S. at 16 ("[W]hen a purchaser is 'forced' to buy a product he would not have otherwise bought even from another seller in the tied-product market, there can be no adverse impact on competition because no portion of the market which would otherwise have been available to other sellers has been foreclosed.").

Indeed, Fireweed's allegations regarding harm to the tied product market are insufficient if the per se standard were to apply.  Even under the per se analysis, a

---

[7]  Indeed, "The Drew Carey Show" competes in the same relevant market as "Friends" – the market for syndicated television programming – which is yet another reason why Fireweed has failed to state a tying claim.  "[A] tying arrangement cannot exist unless two separate product markets have been linked." *Jefferson Parish*, 466 U.S. at 21.

**Davis Wright Tremaine LLP**
LAW OFFICES
Suite 800 · 701 West 8th Avenue
Anchorage, Alaska 99501
(907) 257-5300 · Fax: (907) 257-5399

plaintiff must show that as a result of the tie, "a substantial volume of commerce is

foreclosed thereby." *Jefferson Parish*, 466 U.S. at 16; *see also Robert's Waikiki U-Drive,*

*Inc.*, 732 F.2d at 1407.  The absence of allegations in the Counterclaims regarding harm

to the tied product market noted *supra*, dooms Fireweed's tying claim even if the claim

were analyzed under the per se rule.  *See Jefferson Parish*, 466 U.S. at 16 (a tie that only

forced one purchaser to buy the tied product does not justify per se condemnation).

Fireweed's conclusory assertion that the alleged tie "affected a substantial amount of

commerce" is wholly insufficient.  *See Les Shockley Racing, Inc.*, 884 F.2d at 508

(claimant under Section 1 of the Sherman Antitrust Act "may not merely recite the bare

legal conclusion that competition has been restrained unreasonably.  Rather, a claimant

must, at a minimum, sketch the outline of the antitrust violation <u>with allegations of</u>

<u>supporting factual detail</u>") (emphasis added).

        In sum, the Counterclaims epitomize the kind of tying claim that should be

dismissed under Rule 12(b)(6):  "'the complaint states no set of facts which, if true,

would constitute an antitrust offense, notwithstanding its conclusory language regarding

the elimination of competition and improper purpose.'" *SmileCare*, 88 F.3d at 783

(quoting *Rutman Wine Co.*, 829 F.2d at 735).

        b.      **WBDTD Did Not Coerce Fireweed Into Licensing "The
                Drew Carey Show."**

        As the quote from *Jefferson Parish* emphasizes, coercion is an element of every

tying claim; indeed, it is the "essential characteristic."  466 U.S. at 12; *see also Times-*

**Davis Wright Tremaine LLP**
LAW OFFICES
Suite 800 · 701 West 8th Avenue
Anchorage, Alaska 99501
(907) 257-5300 · Fax: (907) 257-5399

*Picayune Publ'g Co. v. United States*, 345 U.S. 594, 605 (1953) ("[A] seller coerces the abdication of buyers' independent judgment as to the 'tied' product's merits.").  In *Murphy v. Business Cards Tomorrow, Inc.*, 854 F.2d 1202 (9th Cir. 1988), the Ninth Circuit affirmed the dismissal of a tying claim because there was no evidence that anyone bought the tied product under coercion.  The Court should reach a similar result here.

As reflected in the Drew Carey Agreement, Fireweed <u>offered</u> to license "The Drew Carey Show"; WBDTD did not coerce Fireweed into entering that agreement. Paragraph H of the agreement states:  "It is understood and agreed that this Agreement is contingent upon Warner's acceptance of Station's offer dated May 25, 2000 relating to the licensing of the series currently entitled FRIENDS."  *See* Appendix A.  Thus, Fireweed made an agreement to make a license for "The Drew Carey Show" part of its offer for the rights to "Friends."  Acceptance of the Drew Carey Agreement was contingent on whether WBDTD agreed to license "Friends" to Fireweed.  This does not describe a tying arrangement by WBDTD.  The fact that WBDTD entered into the Friends II Agreement without also entering into a second agreement for "The Drew Carey Show" with Fireweed buttresses the conclusion that WBDTD did not tie "The Drew Carey Show" and "Friends" or force "The Drew Carey Show" on Fireweed.

**Davis Wright Tremaine LLP**
LAW OFFICES
Suite 800 · 701 West 8ᵗʰ Avenue
Anchorage, Alaska 99501
(907) 257-5300 · Fax: (907) 257-5399

Without coercion, there is no interference with competition in the market for the tied product, and no antitrust violation.[8]

## 2. Fireweed Has Failed to State a Claim for Restraint of Trade.

After its attempt to allege a tying claim, Fireweed changes course and makes a series of allegations regarding the WB 100+ Network. Fireweed contends that WBDTD developed the WB 100+ Network, and then WBDTD licensed an assortment of syndicated television programming from "Warner Bros. Syndication" and other third parties. Counterclaims ¶¶ 7-8. According to Fireweed, "[t]he contracts between [WBDTD] and the third party syndicators for the WB 100+ Network contained exclusivity clauses that prevented third party syndicators from selling any of their syndicated television programming to broadcast stations in the markets smaller than the top 100 television markets." *Id.* ¶ 9. Fireweed contends that as a result of the alleged exclusivity clauses, third party syndicators "could not" license programming to Fireweed. *Id.* ¶ 11. Although Fireweed believes these allegations add up to an illegal combination to restrain trade in and/or attempted monopolization of some unidentified market, *id.* ¶ 12, in reality they fail to state a claim against WBDTD for any number of reasons.

---

[8] The Court does not have to accept as true Fireweed's allegation that WB conditioned the granting of the license for "Friends" on Fireweed's agreement to accept the license for "The Drew Carey Show," *see* Counterclaims ¶ 4, given that this allegation is contradicted by the Drew Carey Agreement itself. *Ott v. Home Savings & Loan Ass'n*, 265 F.2d 643, 646 n.1 (9th Cir. 1958) (allegations that are inconsistent with the terms of documents attached to the complaint or incorporated therein need not be accepted as true); *Interstate Natural Gas Co. v. Southern Cal. Gas Co.*, 209 F.2d 380, 384 (9th Cir. 1953) (same).

**Davis Wright Tremaine LLP**
LAW OFFICES
Suite 800 · 701 West 8th Avenue
Anchorage, Alaska 99501
(907) 257-5300 · Fax: (907) 257-5399

To begin with, Fireweed has failed to allege that <u>WBDTD</u> is responsible for imposing the exclusivity clauses in the contracts to purchase programming from syndicators.  It is wholly implausible that WBDTD, an entity that is "among the world's largest and most well-known distributors of syndicated television programming," Counterclaims ¶ 8, would purchase programming <u>from</u> third parties for the Network as Fireweed alleges.  The Court need not accept such unreasonable allegations.  *Sprewell v. Golden State Warriors*, 266 F.3d 979, 988 (9th Cir. 2001) ("Nor is the court required to accept as true allegations that are merely conclusory, unwarranted deductions of fact, or unreasonable inferences.").  Indeed, elsewhere the Counterclaims recognize that WBDTD provides content <u>to</u> the WB 100+ Network, rather than obtaining content <u>for</u> the Network.  Fireweed alleges that programming was licensed for the WB 100+ Network from "Warner Bros. Syndication," in other words, programming was licensed from <u>WBDTD</u>.  This is entirely consistent with an example of the contracts that Fireweed contends contain the exclusivity provision:  the contract demonstrates that WBDTD provided content to, but did not license content for, the WB 100+ Network.  Appendix D (contract between WBDTD and an entity affiliated with the WB 100+ Station Group).

In any event, even if the Court were to assume that WBDTD procured programming for the WB 100+ Network, Fireweed has failed to state a claim.  To prove an illegal combination to restrain trade under Section 1 of the Sherman Antitrust Act, a plaintiff must show:  "'(1) an agreement among two or more persons or distinct business

**Davis Wright Tremaine LLP**
LAW OFFICES
Suite 800 · 701 West 8ᵗʰ Avenue
Anchorage, Alaska 99501
(907) 257-5300 · Fax: (907) 257-5399

entities; (2) which is intended to harm or unreasonably restrain competition; and (3) which actually causes injury to competition.'" *Murphy*, 854 F.2d at 1205 (9th Cir. 1988) (quoting *Reid Bros. Logging Co. v. Ketchikan Pulp Co.*, 699 F.2d 1292 (9th Cir. 1983)).[9] Fireweed's allegations fail to satisfy the elements of a claim for restraint of trade.

### a. Fireweed Has Failed to Allege the Existence of a Conspiracy that is Intended to Restrain Trade.

"Unilateral conduct by a single firm, even if it 'appears to restrain trade unreasonably,' is not unlawful under section 1 of the Sherman Act." *The Jeanery, Inc. v. James Jeans, Inc.*, 849 F.2d 1148, 1152 (9th Cir. 1988) (quoting *Copperweld Corp. v. Independence Tube Corp.*, 467 U.S. 752, 767 (1984)). Therefore, "the first step in a § 1 analysis is to determine the identity of the alleged conspirators and the content of the alleged conspiracy." *T.W. Elec. Service, Inc. v. Pacific Elec. Contractors Ass'n*, 809 F.2d 626, 633 (9th Cir. 1987) (emphasis added).

Fireweed trips up on this "first step." The Counterclaims utterly fail to allege any conspiracy to prevent "third party syndicators from selling their syndicated television programming." Counterclaims ¶ 9. Rather, Fireweed only contends that WBDTD was responsible for the exclusivity clauses that supposedly precluded syndicators from

---

[9] These allegations also fail to state a claim under Section 3 of the Clayton Act because that Act only relates to tangible products, not licenses. *See supra*, n.5. Moreover, Section 3 only prohibits sellers from selling goods on the condition that a "lessee or purchaser . . . not use or deal in the goods, wares, merchandise, machinery, supplies, or other commodities of a competitor or competitors of the lessor or seller." 15 U.S.C. § 14; *Commercial Data Servers, Inc. v. IBM*, 262 F. Supp.2d 50, 75 (S.D.N.Y. 2003). In contrast, Fireweed alleges that WB as a buyer of programming allegedly required sellers not to sell to other buyers, like Fireweed. Counterclaims ¶¶ 9-11.

Davis Wright Tremaine LLP
LAW OFFICES
Suite 800 · 701 West 8ᵗʰ Avenue
Anchorage, Alaska 99501
(907) 257-5300 · Fax: (907) 257-5399

licensing programming to Fireweed.[10]  Nor would the alleged agreements between

WBDTD, an alleged buyer of programming for the Network, and the syndicators supply

the conspiracy required by Section 1.  Only those contracts, combinations, or

conspiracies "in restraint of trade" satisfy Section 1, which means that Fireweed must

allege that WBDTD and the syndicators shared a "'a conscious commitment to a

common scheme designed to achieve an unlawful objective.'"  *Monsanto Co. v. Spray-*

*Rite Serv. Corp.*, 465 U.S. 752, 764 (1988) (quoting *Edward J. Sweeney & Sons, Inc. v.*

*Texaco, Inc.*, 637 F.2d 105, 111 (3d Cir. 1980)); *see also Morgan, Strand, Wheeler &*

*Biggs v. Radiology, Ltd.*, 924 F.2d 1484, 1488 (9th Cir. 1991) (exclusive service contract

does not prove the existence of a conspiracy); *49ER Chevrolet, Inc. v. General Motors*

*Corp.*, 803 F.2d 1463, 1467 (9th Cir. 1986) (existence of sales contracts not enough to

prove antitrust conspiracy).  Fireweed has failed to make any such allegations.

The absence of a conspiracy to restrain trade means that Fireweed has failed to

state a claim for an unlawful restraint of trade, and that this claim should therefore be

dismissed.

Davis Wright Tremaine LLP
LAW OFFICES
Suite 800 · 701 West 8ᵗʰ Avenue
Anchorage, Alaska 99501
(907) 257-5300 · Fax: (907) 257-5399

---

[10] Even if Fireweed were complaining that WB refused to sell programming to Fireweed, that would not constitute an antitrust violation.  Antitrust law has long recognized that entities can restrict to whom they sell their products without running afoul of Section 1 of the Sherman Act.  *United States v. Colgate & Co.*, 250 U.S. 300, 307 (1919) (a manufacturer has the "right . . to exercise his own independent discretion as to parties with whom he will deal"); *49ER Chevrolet, Inc. v. General Motors Corp.*, 803 F.2d 1463, 1468 (9th Cir. 1986) ("[I]t is a longstanding antitrust principle that Section 1 of the Sherman Act does not preclude a party from unilaterally determining the parties with whom it will deal and the terms on which it will transact business.").

**b.    Even if Fireweed Had Alleged the Requisite Conspiracy, Its Restraint of Trade Claim Fails Due to the Absence of Any Alleged Harm to Competition.**

Even if Fireweed had successfully alleged an unlawful agreement or conspiracy to restrain trade, Fireweed's Counterclaims still warrant dismissal because the alleged facts are incapable of showing actual harm to competition in a properly defined market. *Business Electronics*, 485 U.S. at 735-36 (rule of reason, not *per se* rule, applies to claims regarding vertical nonprice restraints); *Rutman Wine*, 829 F.2d at 734 (same).  To show that the alleged exclusivity provision had the requisite effect, Fireweed must define the relevant geographic and product markets, and demonstrate the provision's anticompetitive effects within those markets.  *Metro Indus., Inc. v. Sammi Corp.*, 82 F.3d 839, 847-48 (9th Cir. 1996) (to prove anticompetitive effect, the plaintiff must establish "'injury to competition, beyond the impact on the claimant, within a field of commerce in which the claimant is engaged'") (quoting *Austin v. McNamara*, 979 F.2d 728 (9th Cir. 1992)); *see also Mathews v. Lancaster Gen. Hosp.,* 87 F.3d 624, 639-41 (9th Cir. 1996); *Rutman Wine*, 829 F.2d at 734-36.

Fireweed appears to identify "broadcast stations in markets smaller than the top 100 television markets" throughout the United States as the relevant market allegedly affected by the restrictions imposed on syndicators, Counterclaims ¶ 9, but does not allege facts remotely capable of demonstrating that WBDTD has sufficient power to harm competition in this market.  The Counterclaims are bereft of any factual allegations

Davis Wright Tremaine LLP
LAW OFFICES
Suite 800 · 701 West 8th Avenue
Anchorage, Alaska 99501
(907) 257-5300 · Fax: (907) 257-5399

even suggesting that WBDTD has market power as a <u>purchaser</u> of programming.  The only area in which the Counterclaims assert that WBDTD has market power, albeit unsuccessfully, is as a <u>provider</u> of programming.

The failure to allege facts showing that the WBDTD has sufficient market power to harm competition in the relevant market is fatal to Fireweed's claim.  *See McGlinchy v. Shell Chem. Co.,* 845 F.2d 802, 811-13 (9th Cir. 1988) ("It is the impact upon competitive conditions in a definable market which distinguishes the antitrust violation from the ordinary business tort.  [The] failure to allege injury to competition is a proper ground for dismissal by judgment on the pleadings.").[11]

**B.      Fireweed Has Failed to Allege Viable State-Law Antitrust Claims.**

Fireweed has also asserted tying counterclaims under California and Alaska law. The analysis provided above in regard to the federal tying claim applies with equal force to the state-law claims, and supports dismissal of these claims.

**1.      The Court Should Dismiss Fireweed's Tying Claim Under California Law.**

Fireweed asserts that the alleged tie has violated Cal. Bus. & Prof. Code §§ 16720, 16726, and/or 16727.[12]  Interpretations of the Sherman Antitrust Act are used as an aid in

---

[11] WB's lack of power in the relevant market also is fatal to an attempted monopolization under Section 2 of the Sherman Antitrust Act, in the event that Fireweed intended to allege a claim under this statute despite the absence of any reference to it in the Counterclaims.  *Alaska Airlines, Inc. v. United Airlines, Inc.*, 948 F.2d 536, 541-42 (9th Cir. 1991).

[12] Section 16727 will not apply to Fireweed's claims.  Section 16727 only applies to contracts for the sale of "goods, merchandise, machinery, supplies, commodities."  The construction of this language follows Section 3 of the Clayton Act, *Fisherman's Wharf Bay Cruise Corp. v. Superior Court*, 114 Cal. App. 4th 309, 341 (2003), and therefore does not apply to intangible items like the broadcast programming licenses

**Davis Wright Tremaine LLP**
LAW OFFICES
Suite 800 · 701 West 8th Avenue
Anchorage, Alaska 99501
(907) 257-5300 · Fax: (907) 257-5399

Davis Wright Tremaine LLP
LAW OFFICES
Suite 800 · 701 West 8ᵗʰ Avenue
Anchorage, Alaska 99501
(907) 257-5300 · Fax: (907) 257-5399

evaluating claims under the California antitrust statute, the Cartwright Act. *Morrison v. Viacom, Inc.*, 66 Cal. App. 4th 534, 541 & n.2 (1998) ("Federal law interpreting Sherman Act section 1 is useful when addressing issues arising under section 16720."). Indeed, the same analysis is applied to tying claims brought under the Cartwright Act as under the Sherman Antitrust Act. *Tele Atlas N.V.*, 397 F. Supp.2d at 1191.

Thus, Fireweed's tying claim under the Cartwright Act should be dismissed for the same reasons its Sherman Antitrust Act tying claim deserves dismissal. For example, a violation of the Cartwright Act requires proof of harm to competition in the tied product market, which means that the plaintiff must allege that it would have purchased the tied product from someone else if it was not forced to buy the product from the plaintiff as a result of the tie. *Morrison*, 66 Cal. App. 4th at 542-44. Fireweed makes no such allegations, meaning it has failed to allege a viable tying claim under the Cartwright Act.

Similarly, like the Sherman Antitrust Act, the Cartwright Act is concerned with sellers who <u>force</u> buyers to accept one product in order to obtain another. *RLH Indus., Inc. v. SBC Communications, Inc.*, 133 Cal. App. 4th 1277, 1283-84 (2005) (lack of evidence showing that defendant tied two services was fatal to plaintiff's claim; customers can choose to buy the products separately), *rev. denied* (2006). Because the

at issue here. *Tele Atlas N.V.*, 397 F. Supp. 2d at 1190 n.7, 1192-93; *see also Morrison v. Viacom, Inc.*, 66 Cal. App. 4th 534, 546-48 (1998). Section 16726 may apply to Fireweed's claim, but it does not provide any substantive standards for evaluating it. The statute simply states "[e]xcept as provided in this chapter, every trust is unlawful, against public policy and void." Cal. Bus. & Prof. Code § 16726. Thus, Fireweed's claim should be analyzed under Section 16720.

WARNER BROS. MOTION TO DISMISS DEFENDANT'S COUNTERCLAIMS - 26
ANC 89977v1 40529-5

Counterclaims show that Fireweed offered to take the license for "The Drew Carey

Show" and was not forced to do so by WBDTD, no tie exists.

### 2. The Court Should Dismiss Fireweed's Tying Claim Under Alaska Law.

Fireweed has also alleged that WBDTD engaged in tying in violation of AS

45.50.566.  This statute provides:

> It is unlawful for a person to lease or make a sale or contract
> for sale of goods, wares, merchandise, machinery, supplies, or
> other commodities, or services, whether patented or
> unpatented, for use, consumption, enjoyment, or resale, or fix
> a price charged for it, or discount from, or rebate upon, that
> price, on the condition, agreement, or understanding that the
> lessee or purchaser will not use or deal in the goods, wares,
> merchandise, machinery, supplies, or other commodity or
> service of a competitor or competitors of the lessor or seller,
> if the effect of the lease, sale or contract for sale, or of the
> condition, agreement, or understanding may be substantially
> to lessen competition or tend to create a monopoly in any line
> of commerce.

AS 45.50.566.  On its face, it is far from clear that this statute even reaches tying

arrangements.  The Alaska Supreme Court has interpreted the statute as "prohibit[ing]

transactions or agreements not to use or deal in commodities or services of a competitor

of the seller or lessor, if the effect may be to substantially lessen competition or tend to

create a monopoly.  Specifically mentioned are price fixing and price discounting."

*Petroleum Sales, Ltd. v. Mapco Alaska, Inc.*, 687 P.2d 923, 928 (Alaska 1984).

Fireweed's Counterclaims do not fit within the conduct prohibited by AS 45.50.566.

Davis Wright Tremaine LLP
LAW OFFICES
Suite 800 · 701 West 8ᵗʰ Avenue
Anchorage, Alaska 99501
(907) 257-5300 · Fax: (907) 257-5399

In any event, courts use cases construing federal antitrust statutes in deciding claims under Alaska antitrust law. *Petroleum Sales*, 687 P.2d 928-29 (citing federal antitrust cases); *see also Alakayak v. British Columbia Packers, Ltd.*, 48 P.3d 432, 448-50 (Alaska 2002) (AS 45.50.562 is analogous to Sherman Antitrust Act Section 1 and the case law interpreting the Sherman Act is used as a guide for interpreting this statute). Thus, even if AS 45.50.566 applied to Fireweed's claims, or if Fireweed were to amend the Counterclaims to cite another provision in the Alaska statutes that arguably reaches tying claims, its claim should be dismissed for the same reason as its federal antitrust claims.

C.     **Fireweed Cannot State a Claim for Breach of Contract Because Its Allegations Find No Support in the Terms of the Agreement and it Does Not Allege that TBS Engages in Local Origination Cable Casting.**

Count IV of Fireweed's Counterclaims asserts that WBDTD breached the parties' Agreements by permitting cablecasts of "Friends" and/or "The Drew Carey Show" on TBS, and by selling DVDs of these programs within Fireweed's designated community. Since Fireweed "relied on the terms and effect of the [Agreements] in drafting the [counterclaim]," this Court "need not accept its description" of the Agreements, "but may look to the agreement[s]" themselves to determine whether the facts alleged by Fireweed amount to a breach of the Agreements. *Broder v. Cablevisions Systems Corp.,* 418 F.3d 187, 196 (2nd Cir. 2005). Even a cursory review of the exclusivity provision in the

**Davis Wright Tremaine LLP**
LAW OFFICES
Suite 800 · 701 West 8ᵗʰ Avenue
Anchorage, Alaska 99501
(907) 257-5300 · Fax: (907) 257-5399

contracts confirm that these provisions were not breached even if the Court accepts as true the facts alleged by Fireweed.

Section 18 of WBDTD's Standard Terms and Conditions (which are attached to and part of the Friends I & II and Drew Carey Agreements) establishes the scope of the exclusive rights granted Fireweed:

> EXCLUSIVITY.  Warner agrees that during the License Term it will not license any Episode:
>
> (i) For broadcast by any other television station located in a community less than 35 miles away from the Station's respective reference point, as determined pursuant to the rules and regulations of the F.C.C. as of the date of this Agreement (see 47 CFR Section 76.53); or
>
> (ii) For local origination cablecasting by any cable television system operating within the "specified zone" of the Station's designated community in the market as defined by the rules and regulations of the F.C.F. as of the date of the Agreement (see 47 CFR Section 76.5(f).
>
> Station shall, by the terms of this Agreement, be entitled to invoke the protection against duplication of programming imported under Compulsory Copyright License, as provided in Section 76.151 of the FCC Rules ("Syndex"). Notwithstanding the foregoing, Station's right to invoke Syndex shall not apply to any broadcasts and/or cablecasts of the Series on WTBS.

*See* Appendices A-C (Exh. A § 18) (emphases added).[13]  Thus, Section 18 prohibits WBDTD from licensing episodes of "Friends" or "The Drew Carey Show" (1) for

---

[13]  Section 18 of Exhibit A to the Friends II Agreement references Section 76.101, not .151, of the FCC Rules but otherwise resembles the other two Agreements.  *See* Appendix C.

Davis Wright Tremaine LLP
LAW OFFICES
Suite 800 · 701 West 8th Avenue
Anchorage, Alaska  99501
(907) 257-5300 · Fax: (907) 257-5399

broadcast by any television station located in the relevant community, or (2) for local origination cablecasting by any cable television station operating within the station's designated community. *Id.*

Fireweed's own allegations demonstrate that WBDTD did not breach any portion of Section 18. Fireweed admits that TBS is not a "television station" and "does not broadcast," Counterclaims ¶ 31, which means that WBDTD could not have breached Section 18(i)'s prohibition on licensing the programming for "broadcast by any other television station located in a community less than 35 miles away from the Station's respective reference point." Fireweed's allegations are similarly insufficient to show a violation of Section 18(ii). Fireweed merely contends that TBS is a cable system operating within Fireweed's designated community. Counterclaims ¶ 31. It has not alleged that TBS engages in "local origination cablecasting," nor could it make such an allegation in good faith given that TBS's services are clearly not so limited. Thus, by licensing the programming to TBS, WBDTD has not breached the prohibition on licensing the programming for "local origination cablecasting" contained in Section 18(ii) of the Agreements.

Fireweed also claims that WBDTD breached the parties' contracts by selling DVDs of "Friends" and/or "The Drew Carey Show" in the Anchorage market. Again, however, there is nothing in the exclusivity provisions of the Agreements, or elsewhere, that in any way prohibits WBDTD from selling DVDs of such programming, nor has

**Davis Wright Tremaine LLP**
LAW OFFICES
Suite 800 · 701 West 8ᵗʰ Avenue
Anchorage, Alaska  99501
(907) 257-5300 · Fax: (907) 257-5399

Fireweed pointed to any such provision.  Fireweed's wholly conclusory statement that

sale of DVDs constituted a breach is insufficient as a matter of law to state a claim for

breach of contract.  *See Rutman Wine*, 829 F.2d at 736 (party cannot state a claim by

alleging legal conclusions).

Count IV of Fireweed's Counterclaim should therefore be dismissed with

prejudice.

**D.     Fireweed Does Not State a Claim for Relief Under the California Unfair Practices Act.**

Count V of Fireweed's Counterclaims alleges that WBDTD violated the California

Unfair Practices Act ("California Act") by billing Fireweed prior to making available

episodes of "Friends" and "The Drew Carey Show," and by selling DVDs of "Friends"

and "The Drew Carey Show" in the Anchorage market.  This claim fails both because

California law does not apply to conduct in Alaska, and because none of the facts alleged

would constitute an unfair practice within the meaning of the California Act even if the

California Act were applicable.

Fireweed has pleaded no facts that support application of California's regulatory

laws to conduct occurring within the State of Alaska.  It is well established that "[l]aws

have no force of themselves beyond the jurisdiction of the State which enacts them, and

can have extraterritorial effect only by the comity of other states." *American Libraries*

*Association v. Pataki*, 969 F. Supp. 160, 176 (S.D.N.Y. 1997) (quoting *Huntington v.*

*Attrill*, 146 U.S. 657, 669, 13 S. Ct. 224, 228, 36 L. Ed. 1123 (1892)); *see also Mayberry*

**Davis Wright Tremaine LLP**
LAW OFFICES
Suite 800 · 701 West 8th Avenue
Anchorage, Alaska 99501
(907) 257-5300 · Fax: (907) 257-5399

1  *v. Said*, 911 F. Supp. 1393, 1404 (D. Kan. 1995) ("[A] state is sovereign only within its

2  own boundaries and its laws have no extraterritorial force.") (citations omitted).  Here,

3  Fireweed has not claimed that any of the allegedly improper conduct upon which its

4  unfair practices claim is based occurred within the State of California, thus the conduct is

5  not subject to California law.  As such, Fireweed cannot bring a claim for relief based on

6  the California Act and Count V of its Counterclaims must be dismissed with prejudice.

7       Even if California law could govern conduct occurring in the State of Alaska,

8  which it cannot, Fireweed's claim under the California Act still would not state a valid

9  claim for relief because none of the conduct alleged by Fireweed constitutes an unfair

10  trade practice.  Fireweed alleges that WBDTD engaged in improper billing practices "by

11  billing Fireweed for the extended term Friends, Friends 2nd Cycle and/or The Drew Carey

12  Show series when Plaintiff had not made such additional episodes available to

13  defendant," and that WBDTD sold DVDs of "Friends" and "The Drew Carey Show" in

14  the Anchorage market.  Counterclaims ¶¶ 35-36.  These facts do no come close to the

15  kind of "unfair, dishonest, deceptive, destructive, fraudulent [or] discriminatory practice

16  by which fair and honest competition is destroyed" that is the concern of the California

17  Act.  *Cel-Tech Communications v. L.A. Cellular*, 973 P.2d 527, 539 (Cal. 1999).  Since

18  Fireweed was broadcasting "Friends" and "The Drew Carey Show" on KYES, it could

19  hardly allege, nor does it, that WBDTD concealed what "episodes" had been made

**Davis Wright Tremaine LLP**
LAW OFFICES
Suite 800 · 701 West 8th Avenue
Anchorage, Alaska 99501
(907) 257-5300 · Fax: (907) 257-5399

available to it when it received bills from WBDTD.  Nor has Fireweed pointed to

anything deceptive or unfair about WBDTD distributing the programming on DVDs.

In the event that Fireweed's claim under the California Act relies on alleged

breaches of the Agreements, the claim fails.  As demonstrated above, the parties'

Agreements in no way prohibit the sale of DVDs containing the programming in the

Anchorage market.  If Fireweed wanted to prohibit WBDTD from selling DVDs in the

Anchorage market, it should have bargained for such a provision in the contracts.  Insofar

as Fireweed alleges that it was billed prematurely, which it was not, its remedy would

simply have been not to pay such bills until payments were in fact due under the contract.

More importantly, even if the Agreements did prohibit WBDTD from selling DVDs of

"Friends" and "The Drew Carey Show," or if WBDTD breached the Agreements by

prematurely billing for programming, such conduct would not constitute an unfair trade

practice.  "A mere breach of contract, even if intentional, does not amount to an unfair or

deceptive trade practice."  *G.E.B., Inc. v. QVC, Inc.*, 129 F.Supp.2d 856, 861 (M.D.N.C.

2000); *see also Landreneau v. Fleet Financial Group*, 197 F. Supp.2d 551, 557 (M.D. La.

2002) (no unfair trade practices claim where conduct at issue was merely alleged to

breach contract); *City of Bridgeport v. Arielscope, Inc.*, 122 F. Supp.2d 275, 278 (D.

Conn. 2000) (breach of contract generally does not constitute unfair trade practice).

**Davis Wright Tremaine LLP**
LAW OFFICES
Suite 800 · 701 West 8th Avenue
Anchorage, Alaska  99501
(907) 257-5300 · Fax: (907) 257-5399

In sum, no section of the California Act could be implicated by the conduct alleged. Fireweed cannot state a claim for relief under the California Act, and the Fifth Count set forth in its Counterclaims should therefore be dismissed with prejudice.

**E.     Fireweed Cannot State a Claim for Violation of the Alaska Unfair Trade Practices Act.**

Fireweed's claim under the Alaska Unfair Trade Practices Act ("Alaska Act") is based on the same conduct alleged in support of its claim under the California Act, and fails for the same substantive reasons.

AS 45.50.471 prohibits "unfair or deceptive acts or practices in the conduct of trade or commerce," and identifies 50 specific practices that violate the statute. Fireweed's Counterclaims do not reference a specific provision of the Alaska Act that it claims was violated, nor does the conduct alleged implicate the general prohibition on unfair or deceptive acts contained in the Alaska Act:

> Unfairness will be determined by a variety of factors, including: (1)Whether the practice, without necessarily having been previously considered unlawful, offends public policy as it has been established by statutes, the common law, or otherwise-whether, in other words, it is within at least the penumbra of some common law, statutory, or other established concept of unfairness; (2) whether it is immoral, unethical, oppressive, or unscrupulous; and (3) whether it causes substantial injury to consumers (or competitors or other businessmen).

*State v. O'Neill Investigations, Inc.*, 609 P.2d 520, 535 (Alaska 1980) (internal citations omitted).

Davis Wright Tremaine LLP
LAW OFFICES
Suite 800 · 701 West 8ᵗʰ Avenue
Anchorage, Alaska 99501
(907) 257-5300 · Fax: (907) 257-5399

As set forth above, Fireweed has not pleaded any facts that indicate that

WBDTD's sale of DVDs of "Friends" and "The Drew Carey Show" in the Anchorage

market is against public policy, unethical, oppressive, or unscrupulous.  The same is true

of Fireweed's allegations regarding WBDTD's billings for the reasons set forth above.

Insofar as Fireweed contends that any of this conduct constitutes a breach of contract, a

breach of contract does not amount to an unfair trade practice.  *G.E.B., Incorporated*, 129

F.Supp.2d at 86; *Landreneau*, 197 F.Supp.2d at 557.

Fireweed's Counterclaims do not state a claim for violation of the Alaska Act and

should be dismissed.

> **F.     Fireweed's Counterclaims Do Not State a Claim for Intentional Interference with Prospective Economic Advantage Under California Law.**

Count VIII of Fireweed's Counterclaims asserts a claim for intentional

interference with prospective economic advantage under California law.  To state a claim

for intentional interference with prospective economic advantage under California law, a

plaintiff must demonstrate:

> (1)     an economic relationship between the plaintiff and some third party, with the probability of future economic benefits to the plaintiff;
> (2)     the defendant's knowledge of the relationship;
> (3)     intentional acts on the part of the defendant designed to disrupt the relationship;
> (4)     actual disruption of the relationship; and
> (5)     economic harm to the plaintiff proximately caused by the acts of the defendant.

**Davis Wright Tremaine LLP**
LAW OFFICES
Suite 800 · 701 West 8th Avenue
Anchorage, Alaska 99501
(907) 257-5300 · Fax: (907) 257-5399

*Korea Supply v. Lockheed Martin Corp.*, 63 P.3d 937, 950 (Cal. 2003). The California

Supreme Court has made clear that "the third element also requires a plaintiff to plead

intentional wrongful acts on the part of the defendant designed to disrupt the

relationship." *Id*. at 950-51. An act is not wrongful "merely because defendant acted

with an improper motive" *Id*. at 953. Rather, "an act is independently wrongful if it is

unlawful, that is if it is proscribed by some constitutional, statutory, regulatory, common

law, or other determinable legal standard." *Id*. at 954.

     Fireweed's allegations fail to satisfy the third element. Fireweed complains that

WBDTD inserted restrictive clauses into contracts by which WBDTD purchased

programming. As explained *supra* in regards to the federal antitrust claims, it is wholly

implausible that WBDTD would purchase programming from third parties, and a

representative contract (which is incorporated by reference into the Counterclaims)

demonstrates that WBDTD <u>sold</u> programming to the WB 100+ Network rather than buy

programming for the Network. Moreover, even if true, WBDTD's conduct does not

violate the antitrust or unfair trade practices laws, and thus is not "independently

wrongful" as the third element of the statute requires. Fireweed has not, and cannot, state

a claim for intentional interference with prospective economic advantage under

California law.

**Davis Wright Tremaine LLP**
LAW OFFICES
Suite 800 · 701 West 8th Avenue
Anchorage, Alaska 99501
(907) 257-5300 · Fax: (907) 257-5399

### G.    Fireweed Cannot State a Claim for Intentional Interference With Prospective Economic Advantage Under Alaska Law.

Fireweed's intentional interference claim under Alaska law fails for the same reasons as its California law claim. Alaska, like California, requires that conduct alleged to give rise to a claim for intentional interference with prospective economic advantage be "wrongful." *Ellis v. City of Valdez*, 686 P.2d 700, 707 (Alaska 1984). Although the Alaska Supreme Court has not established the precise boundaries of what constitutes wrongful conduct, it has relied upon California case law to establish the requirements of the tort. *Id.* (citing *Buckaloo v. Johnson*, 537 P.2d 865, 871-72 (1975) (modified by *Korea Supply*, 69 P.3d at 950)). As set forth above, California law requires that conduct be unlawful to be considered wrongful. The Alaska Supreme Court noted the logic behind a similar requirement, though without deciding whether to adopt it, in *RAN Corporation v. Hudesman*, 823 P.2d 646, 648 n. 4 (Alaska 1991). Given the logic behind the unlawfulness requirement as presented by the California Supreme Court in *Korea Supply*, and Alaska's prior reliance on California law in adopting the tort of interference with prospective economic advantage, it is likely that the Alaska Supreme Court would follow *Korea Supply* and likewise require that conduct be in some sense unlawful to give rise to a claim for intentional interference with prospective economic advantage. Since, for the reasons stated above in regards to the claim under California law, Fireweed cannot establish that WBDTD engaged in wrongful conduct, it cannot state a claim for intentional interference under the law of Alaska.

**Davis Wright Tremaine LLP**
LAW OFFICES
Suite 800 · 701 West 8th Avenue
Anchorage, Alaska 99501
(907) 257-5300 · Fax: (907) 257-5399

1

## IV.   CONCLUSION

2

For the foregoing reasons, WBDTD respectfully requests that its motion to dismiss

3

Fireweed's Counterclaims be granted, without leave to amend.

4

Dated this ___16th___ day of June, 2006.

5

6

7              s/      Eric J. Jenkins
              DAVIS WRIGHT TREMAINE LLP
8              701 West 8th Avenue, Suite 800
              Anchorage, AK 99501
9              Telephone:  (907) 257-5300
              Facsimile:  (907) 257-5399
10             ABA No. 8106041
              E-mail:  ericjenkins@dwt.com
11

12

13

14

15    Certificate of Service

16    The undersigned certifies that on June 16,  2006, a true and
      correct copy of the foregoing Motion to Dismiss Defendant's
17    Counterclaims was served electronically on the following attorneys
      or parties of record:

18     -  Michael Jungreis

19
      By:  s/      Janet Eastman
20

21

22

23

24

25

**Davis Wright Tremaine LLP**
LAW OFFICES
Suite 800 · 701 West 8th Avenue
Anchorage, Alaska 99501
(907) 257-5300 · Fax: (907) 257-5399