# SYNDICATION LICENSE AGREEMENT
## THE DREW CAREY SHOW

Contract No.: _____ DC 00138 _____

Date: _____ May 25, 2000 _____

This Agreement is entered into between Fireweed Communications Corp., licensee of television station KYES, with an address of 3700 Woodland Drive, Suite 800, Anchorage, AK 99517, ("Station"), and Warner Bros. Domestic Television Distribution, a division of Time Warner Entertainment Company, L.P., with an address of 4000 Warner Boulevard, Triangle Building, Burbank, California 91522 ("Warner").

Warner hereby agrees to license to Station the Free TV (as defined in paragraph 1.B of Exhibit "A") syndication rights in and to certain episodes ("Episodes") of the television series currently entitled "THE DREW CAREY SHOW" ("Series"), in the Anchorage, AK market upon the following terms and conditions:

A.  **Licensed Episodes:** All Episodes of the Series produced for network television.

B.  **License Term:**

1.  **Initial Term:** One hundred thirty (130) consecutive weeks ("Initial Term"), starting on September 9, 2002 ("Start Date"), PLUS:

2.  **Extended Term:** For each broadcast season after and excluding the seventh broadcast season (2001/'02) in which any Episode(s) of the Series shall be initially produced for network television and licensed hereunder ("Additional Episodes"), an additional thirty-nine (39) consecutive weeks shall be added to the Initial Term ("Extended Term"). The following details the Initial and Extended Term based upon network production:

    | Network Seasons | Term |
    | --- | --- |
    | Seasons 1-7 | 130 wks (Initial Term) |
    | Season 8 (02/03) | 39 wks (Extended Term) |
    | Season 9 (03/04) | 39 wks (Extended Term) |
    | Each subsequent Season | 39 wks (Extended Term) |

    Notwithstanding the foregoing, if only six (6) seasons of Episodes are produced for network television (i.e., if the 2000/'01 season is the final network season of the Series) then the Initial Term shall be for a period of ninety-one (91) weeks and there will be no Extended Term. Furthermore, if only five (5) seasons of Episodes are produced for network television (i.e., if the 1999/2000 season is the final network season of the Series) then the Initial Term shall be for a period of fifty-two (52) weeks and there will be no Extended Term.

C.  **Time Period:**

1.  During the Initial Term, Station shall broadcast the Episodes at the rate of one (1) broadcast per day, five (5) days per week, Monday through Friday, during a regularly scheduled time period commencing no earlier than 6:00 PM and ending no later than 8:00 PM. In

*(Drew 100 6/8/00)*

addition, during the first thirteen (13) weeks of the Initial Term only, Station shall also broadcast one (1) Episode each weekend, on Saturday or Sunday, commencing no earlier than 6:00 PM and ending no later than 8:00 PM.

2. During the Extended Term, Station shall broadcast the Episodes at the rate of one (1) broadcast per day, five (5) days per week, Monday through Friday, during a regularly scheduled time period either (i) commencing no earlier than 5:00 PM and ending no later than 8:00 PM or (ii) commencing no earlier than 10:00 PM and ending no later than 11:00 PM.

3. Additional Weekend Runs:  In addition to the telecasts set forth above, Station shall have the option to telecast one (1) additional Episode each week, on Saturday or Sunday, barter free during a time period at Station's discretion (i.e., a seventh telecast during the first 13 weeks and a 6th telecast thereafter).

4. Station shall give Warner two weeks prior written notice if Station elects to move the Episodes within the licensed time period set forth above.

5. Notwithstanding the foregoing, as long as the Series remains on network television, Station shall not broadcast, or schedule for broadcast, any Episode during the same time period as the network time period of the Series, or during Prime Time (i.e., Monday through Saturday 8PM-11PM and Sunday 7PM-11PM (Eastern & Pacific Time) and Monday through Saturday 7PM-10PM and Sunday 6PM-10PM (Central & Mountain Time) or during the current Prime Time schedule of the applicable network telecasting the network runs of the Series during the License Term herein).

D.   **License Fee:** As used herein, the term "Initial Term License Fee" shall mean the weekly license fee applicable to the Initial Term multiplied by the number of weeks comprising the Initial Term (i.e., 130 weeks, or 91 weeks, or 52 weeks as set forth in Paragraph B above); and the term "Extended Term License Fee" shall mean the weekly license fee applicable to the Extended Term multiplied by the total number of weeks comprising the Extended Term.

1. Station shall pay $1,500.00 per week during the Initial Term and the Extended Term, as follows:

2. The Initial Term License Fee in thirty-nine (39) equal consecutive monthly installments (or twenty-one (21) equal consecutive monthly installments if the Initial Term is only ninety-one (91) weeks, or twelve (12) equal consecutive monthly installments if the Initial Term is only fifty-two (52) weeks) commencing on September 1, 2002; and

3. An amount equal to that part of the Extended Term License Fee that is applicable for each broadcast season of Additional Episodes shall be payable in equal consecutive monthly installments commencing on the first day of the month in which such Additional Episodes are made available to Station hereunder and continuing through the applicable License Term resulting therefrom (i.e., the Initial Term as same has been extended as a result of said Additional Episodes and all Additional Episodes made available to Station prior thereto).

E.   **Barter Provisions:**

1. Each Monday through Friday half-hour Episode shall be furnished with one and one-half (1 ½) minutes of commercials inserted by or under

the authority of Warner and Station shall retain the remaining five and one-half (5 ½) minutes of announcement time for its own use. In addition, during the first thirteen (13) weeks of the Initial Term, each half-hour weekend Episode (i.e., the sixth telecast) shall be furnished with three (3) minutes of commercials inserted by or under the authority of Warner and Station shall retain the remaining four (4) minutes of announcement time for its own use. Notwithstanding the foregoing, Station will retain all seven (7) minutes of announcement time within each optional weekend telecast (as set forth in paragraph C.3. above). Nothing in this Agreement shall be construed to limit Warner's right to insert billboards, one (1) fifteen (15) second fee spot and/or closed-captioning sponsor announcement in each Episode, in addition to the above-mentioned commercial time, and Warner specifically reserves such right.

2. Station shall broadcast the given Episode(s) designated by Warner for broadcast during each week, it being understood that Warner shall determine, in its sole discretion, the sequence of such Episodes broadcast and the number of times each such Episode shall be rebroadcast. Station shall broadcast each Episode without deletion or change in the Episode or in the commercials furnished by Warner, except that Station may add its commercial material in the commercial positions provided by Warner.

3. The broadcast by Station of Warner's commercial announcements and the broadcast by Station of each Episode as designated by Warner will be a material part of the consideration for this agreement and, except as provided in subparagraph 5 below, any failure by Station to broadcast a given Episode or the commercial announcements as provided by Warner will constitute default. Warner and Station shall each be entitled to retain all revenues derived from their respective commercials.

4. The commercial time to which Warner is entitled as to each given Episode is referred to herein as "Barter Time". Within thirty (30) days after the close of each calendar month during which the Barter Time is to be run and for one (1) month thereafter, Station shall supply Warner an affidavit certified as correct by an officer of Station, confirming that each Episode (listed by name) and the Barter Time therein (listed by commercial ID number) were actually broadcast as required herein during such calendar month period and the respective date(s) of such broadcast(s). While Warner recognizes Station's responsibility as a broadcast licensee to schedule its programming and to determine the content of its programming and advertising matter, Station's broadcast agreement is of the essence of this agreement and failure by Station to meet its broadcast agreement shall entitle Warner to exercise its rights and remedies, including without limitation those pursuant to Paragraph 13 of the Standard Terms and Conditions.

5. If Station is prevented from making any broadcast hereunder due to a preemption or an event of force majeure affecting Station or Warner, or if, for any other reason, Station fails to make a broadcast of an Episode as designated by Warner, Station shall comply with the provisions in this subparagraph 5. Failure to make good any preempted or prevented broadcast shall be deemed to be a material default by Station unless (a) Station shall notify Warner, in writing of such failure on or before forty-eight (48) hours thereafter and of the reason therefor, and (b) on or before the end of the same broadcast week in which such broadcast was preempted or prevented ("Make Good Period"), Station shall make good such

(Draw 100 6/8/00)

preempted or prevented broadcast by broadcasting such preempted or prevented Licensed Episode in its entirety in a comparable or better time period. or including the commercial inventory of Warner contained in such preempted or prevented Episode in regularly scheduled broadcast(s) of Episode(s) during the Make Good Period and (c) on or before thirty (30) days after the close of such Make Good Period, Station shall furnish to Warner an affidavit certified as correct by an officer of Station that such Licensed Episode (listed by name) and/or commercial inventory (listed by commercial ID number) of Warner contained therein, as the case may be, were actually broadcast during the Make Good Period and the respective date(s) of any such broadcast(s).

F.   **Materials:**  Warner will deliver the Episodes of the Series to Station via satellite with the Barter Time integrated.  If Station requests any Episode and/or commercial reel via videotape, Station will pay $30.00 for each such videotape, payable upon receipt of Warner's invoice therefor. All costs of delivery, including shipping, handling and insurance, will be paid by Station.

G.   **Syndicated Exclusivity:** Station shall be entitled to exercise syndicated program exclusivity rights in accordance with the provisions of paragraph 18 of Exhibit "A" hereof.  Exhibit "B" is attached to and forms a part of this Agreement for Station's use in exercising such syndicated program exclusivity rights.

H.   **Special Provisions:**  It is understood and agreed that this Agreement is contingent upon Warner's acceptance of Station's offer dated May 25, 2000 relating to the licensing of the series currently entitled FRIENDS.

I.   **Terms and Conditions:** The Standard Terms and Conditions for the licensing of the Series are attached hereto as Exhibit "A" and incorporated herein by reference; however, in the event of any inconsistencies, the terms of this Agreement shall control.

In confirmation of the foregoing the parties affix their signatures below:

AGREED TO AND ACCEPTED:

Fireweed Communications Corp.
                (Station)

By: _Carol Schatz_

Its: _GM_

WARNER BROS. DOMESTIC TELEVISION
DISTRIBUTION, a division of Time
Warner Entertainment Company, L.P.

By: _Sherry Louck_

Its: _ Sherry Louck
        Director, Financial Reporting and Accounting_

(Docs 100 6/8/00)

-4-

## EXHIBIT "A"

## STANDARD TERMS AND CONDITIONS - THE DREW CAREY SHOW

**1. TELECASTING RIGHTS.**

A. Episodes may only be telecast: (i) on Free TV up to the number of times specified in the Syndication License Agreement to which these Standard Terms and Conditions are attached ("Agreement") to non-paying audiences; (ii) if the Station ("Station") is a UHF or VHF broadcast, low power, or translator television station, then only from the existing originating television transmitter of the Station specified in the Agreement; and (iii) if the Station is a local cable television system, then only to the individual subscribers of the system located within the Market described in the Agreement.

B. "Free TV" means over-the-air VHF or UHF broadcast, or cable television transmission, causing program reception on a home television receiver or like device free of charge to the viewer. Neither governmental television receiver assessments or taxes, nor periodic service charges made by cable systems (other than a charge for pay television viewing) will be considered a viewer charge.

C. Station may not authorize any telecast to be amplified, retransmitted or relayed by any translator or booster station, satellite, community antenna system, cable television system, or any other method not expressly authorized in this Agreement.

D. Warner reserves all rights in each Episode not licensed hereunder. Warner may exploit such reserved rights as Warner sees fit without restriction.

**2. TERM.** The License Term for each Episode begins on the earlier of the date of first telecast of the Episode, or the Start Date stated in the Agreement. The License Term for each Episode will end on the earlier of the expiration of the License Term as specified in the Agreement or the date of its last licensed telecast.

**3. COMPENSATION TERMS.**

A. CASH: Where the Agreement includes monetary payments, Station will pay the amounts specified for each Episode whether or not all authorized telecasts occur. Monthly payments are due on the first of each consecutive month beginning as stated in the Agreement, continuing uninterrupted until the total license fee is paid or the last authorized telecast, whichever is earlier.

B. BARTER: Where the Agreement includes commercial time, Station will provide the commercial time specified for each Program whether or not the authorized telecasts occur. If Station fails to provide any required commercial time, Station will at Warner's election either promptly provide Warner with comparable substitute commercial time or pay Warner a fair dollar value for such time.

C. GENERAL: Each payment must be made to Warner free of any off-sets, claims, taxes or other charges. Any payment not made within 30 days of its due date will bear interest at the rate of one and one-half percent (1 ½%) per month (or such lower maximum rate, if any, specified by controlling law). Timely payment or provision of all commercial time is of the essence of this Agreement, and is an express condition precedent to Station's right to exercise any telecasting rights in any Episode.

**4. USAGE REPORTS.** Station will notify Warner within ten days after the end of each month regarding the title and dates of telecast of each Episode telecast during the preceding month. Station will furnish Warner with an affidavit of performance with respect to telecast of any of Warner's commercial announcements.

**5. DELIVERY AND RETURN OF MATERIALS.**

A. Warner will deliver materials for the Episodes as specified in the Agreement. If no materials are specified, Warner will notify Station of the materials to be delivered as well as the method of delivery promptly after Warner receives notice from Station of a scheduled telecast date. Warner requires at least thirty days notice of the scheduled telecast date of any Episode. If less than 30 days notice is given, Warner will not be responsible for late delivery.

B. For any Episode delivered on tape, Warner will make available said Episodes on a 1" or 3/4" videotape format as specified in the Agreement. Warner's delivery will be complete when Warner has either physically delivered the Episode to Station or its agent, or has given the Episode to Warner's carrier f.o.b. its place of shipment.

C. For any Booking Episode obtained by Station for the purpose of dubbing onto Station's tape stock, (i.e., book and dub) Station will pay the cost of shipping said Booking Episode to it and, within 3 days and at its own expense, return or transship said Booking Episode to any address specified by Warner. Additionally, any Booking Episode must be returned in the same condition as it was received (allowing for normal wear and tear) or Station shall be held responsible for the cost to duplicate an identical Booking Episode.

D. Station will be responsible for the maintenance, storage and shipping including shipping costs of any Library Episode purchased by Station. Upon completion of contracted telecasts or at the end of the License Term, whichever comes first, Station will, at its option and expense, either return said Library Episode to Warner at an address specified by Warner or provide Warner with a Certificate of Destruction for each Library Episode in said Library.

E. Station may not allow copying except to permit an authorized telecast or part with the possession of any Episode except for return shipment per the Agreement.

**6. MATERIALS.**

A. Station will examine all materials immediately after their receipt. If any are unsuitable Station will immediately notify Warner who will then furnish suitable replacements. An Episode will be deemed suitable unless notice of defect is given within three business days following receipt.

B. All materials which Station produces for the telecast of any Episode will become the property of Warner. At the end of the License Term Station will ship them to the location designated by Warner.

**7. RESTRICTIONS ON ALTERATIONS.**

A. Station, at its own expense, may insert commercials in the Episode(s) but not in a manner which adversely affects an Episode's artistic or pictorial quality. All commercials inserted by Station must be removed without damage before the Episode is returned. A "cut in" fee may not be charged.

B. Except for inserting commercials, Station may not alter or serialize any Episode. Station may not delete or alter the copyright notice, trademark notice or credits in any Episode. Where Warner has provided commercial time, Station will telecast each Episode with commercial(s) provided by Warner.

C. Station will not alter any material provided to Station by Warner without Warner's prior permission, including, but not limited to, print ads, radio, television or cable spots. Nothing in the Agreement shall be construed to limit Warner's right to insert billboards, fee spots, and close-captioning sponsor announcements in the Episode(s), in addition to commercial time set forth in any barter provisions of the Agreement, and Warner specifically reserves such right.

**8. ADVERTISING AND BILLING. USE OF NAMES AND LIKENESSES.** Station will comply with Warner's advertising and billing requirements and Warner's limitations on the use of the names and likenesses of the actors and characters for each Episode, as notified. None of Station's advertising or billing will: (i) infringe on the rights of others; or (ii) constitute an endorsement of any product, service or sponsor, other than the Episode itself. Station will not advertise any Episode withdrawn by Warner. No authorized excerpt from any Episode may exceed 3 minutes or 7500 feet in length.

**9. MUSIC.** Warner represents that the non-dramatic television performing rights in the music embodied in each Episode: (a) are controlled by BMI, ASCAP, SESAC, or other performing rights society having authority over Station's telecast of the Episode; (b) are in the public domain; or (c) are controlled by Warner to the extent necessary to permit Station's telecast of each Episode. Upon request Warner will furnish Station with available music cue sheets for any Episode. With regard to music in category (a), Station will at its own expense obtain any licenses required to telecast or perform any such music.

**10. TAXES.** Station will pay all taxes (including without limitation sales, use, VAT and remittance), duties, and any other charges, including interest and penalties, now or later imposed on or resulting from the license, rental, delivery, telecast, possession or use by Station of any Episode.

**11. SUSPENSION AND WITHDRAWAL.**

A. Warner may either suspend delivery or telecast of any Episode or withdraw any Episode: (a) if Warner determines that its telecast might infringe the rights of others, violate any law, or subject Warner to any liabilities; (b) if Warner determines that its materials are unsuitable for making telecast quality prints, tapes, cassettes or discs; (c) due to Force Majeure.

B. Station will not be entitled to claim damages for any suspension. If any suspension lasts for more than six consecutive months, either party may terminate this Agreement with respect to the suspended Episode on 10 days' notice. The License Term for the suspended Episode will be extended for the length of each suspension.

C. If any Episode is withdrawn or this Agreement is terminated with respect to an Episode after a suspension period, then Warner shall return an equitable proportion of any amounts paid. Station's sole remedy will be to receive such refund except as provided in Paragraph 12.

D. "Force Majeure" means any fire, flood, earthquake, or public disaster, strike or labor dispute, unavailability of any major talent committed to the Episode; unavoidable accident; breakdown of electrical or sound equipment; failure to timely perform by any laboratory or supplier; delay or lack of transportation; embargo, riot, war, insurrection or civil unrest; any Act of God; any act of any legally constituted authority; or any other cause beyond the reasonable control of Warner.

**12. TERMINATION OF PRODUCTION.** If production or delivery of the Episodes is terminated for any reason during the License Term, Warner upon ten (10) days notice to Station may cancel this Agreement without further liability to Warner. License fees shall be prorated to the effective date of termination; Station's barter obligation, if any, will continue until the effective date of termination.

### 13. DEFAULT.

A. Station will default if: (i) Station fails to pay its debts when due; (ii) Station seeks relief under any bankruptcy law or similar provision for the protection of debtors; (iii) Station fails to make any payment in accordance with the terms of this Agreement and such failure continues for a period of ten (10) days; (iv) Station breaches any provision of this Agreement or any other agreement between Station and Warner or any affiliate of Warner; (v) Station attempts to make any assignment, transfer or sublicense of this Agreement without Warner's consent as provided in Paragraph 19A; or (vi) Station ceases or suspends operations.

B. In the event of a default by Station, Warner may terminate this Agreement and/or proceed against Station for legal and equitable relief and/or may suspend delivery of Episodes and declare the License Fee (and additional sums payable under the Agreement) immediately due and payable to Warner regardless of the due date thereof.

C. Default by Warner is limited to the particular Episode to which the default applies. No default as to one Episode will be a default as to any other Episodes. Station will promptly give Warner written notice of any claimed default and Warner will have 20 days after its receipt to commence and diligently pursue cure of such default. Only if Warner fails to do so, may Station proceed against Warner for available relief.

### 14. STATION INSOLVENCY.

If Station files any petition for voluntary relief under any chapter of the Bankruptcy Code ("Code"), or has filed against it any petition for involuntary relief, then Warner may declare Station in default. If Warner is prevented from exercising any of its rights or remedies without first obtaining leave of the bankruptcy court, then Station will, within 30 days of the filing of the petition, arrange for the filing of a motion to affirm or reject this Agreement and will perform all its obligations under this Agreement as if this Agreement were one within the purview of Section 365(d) of the Code. Any costs, damages or expenses incurred by Warner due to any post-petition default(s) will be treated as administrative claims under the Code. If Warner is required to pay any post-petition obligation of Station, then on all amounts so paid Warner will be entitled to administrative priority. All references to the "Bankruptcy Code" refer to the Title 11 United States Code Section 101 et seq. as now existing or later amended.

### 15. WARNER'S WARRANTIES.

Warner represents and warrants that:

A. Warner has authority to license rights specified in this Agreement. Warner has not licensed to another the rights granted to Station.

B. No exercise of rights granted to Station in any Episodes will: (i) infringe any third party's copyright, trademark or other property right; or (ii) defame or violate any right of privacy or infringe any personal right of any third party.

C. Warner will advise Station of information, of which it has actual knowledge, concerning any matter included in the Episode for which any money, service or other valuable consideration was paid, or accepted. This shall not include services or property furnished without charge, or at a nominal charge, for use on an Episode unless it is furnished in consideration for an identification in the Episode of any person, product, services, trademark, or brand name beyond an identification which is reasonably related to the use of the service or property in such Episode.

### 16. INDEMNITIES.

A. Warner will indemnify and hold harmless Station (including its officers, directors, employees and agents) against all claims, expenses (including reasonable attorneys' fees) and liabilities due to Warner's breach of any of its representations or warranties.

B. Station will indemnify and hold harmless Warner (including its officers, directors, employees and agents) against all claims and expenses (including reasonable attorneys' fees) and liabilities due to Station's failure to abide by any restriction on the exercise of any rights granted and for any breach of any of Station's obligations, representations or warranties set out in this Agreement.

### 17. INABILITY TO TELECAST.

If, without Station's fault, the Station is unable to telecast the Episode(s) for 30 or more continuous days by reason of any Act of God, governmental action, war, flood, fire or public emergency, then Station may extend the Term for the duration of any such period but not more than 6 months. This extension will not increase Station's time to make payments. Warner may suspend the delivery of materials during any extension. If Station's inability to telecast continues for more than 6 months, then Warner may terminate this Agreement and give Station an equitable adjustment of the total license fee applicable to the Episodes not telecast.

### 18. EXCLUSIVITY.

Warner agrees that during the License Term it will not license any Episode:

(i) For broadcast by any other television station located in a community located less than 35 miles away from the Station's respective reference point, as determined pursuant to the rules and regulations of the F.C.C. as of the date of this Agreement (see 47 CFR Section 76.53); or

(ii) For local origination cablecasting by any cable television system operating within the "specified zone" of the Station's designated community in its market as defined in the rules and regulations of the F.C.C. as of the date of the Agreement (see 47 CFR Section 76.5(f)).

Station shall, by the terms of this Agreement, be entitled to invoke the protection against duplication of programming imported under Compulsory Copyright License, as provided in Section 76.151 of the FCC Rules ("Syndex"). Notwithstanding the foregoing, Station's

right to invoke Syndex shall not apply to any broadcast and/or cablecasts of the Series on WTBS.

Station may enter into an Agreement, in accordance with FCC regulations, to refrain from exercising the rights granted above provided that all money or other consideration received directly or indirectly by Station for such Agreement shall be paid by Station to Warner, shall be deemed to be the property of Warner and shall not affect any payments otherwise payable by Station hereunder.

Notwithstanding anything to the contrary contained in this paragraph 18 or elsewhere in this License Agreement, it is understood that Warner may permit or license carriage by a third party of the Episodes within Station's specified broadcast zone or community and elsewhere by cable, telephone or any other device, method or system (except free over-the-air broadcasting), but only pursuant to a so-called "on demand" system which allows each viewer to order, on a fee basis or otherwise, the telecast of one or more of the Episodes at any selected time or times.

### 19. ASSIGNMENT.

A. This Agreement is personal to Station. Station may not assign or transfer this Agreement, or sublicense or use an agent to exploit any of the rights granted to Station, whether voluntarily or involuntarily, without Warner's prior written consent. An assignment or transfer of a controlling interest in Station's capital stock or other evidence of ownership will require Warner's consent. If Warner does consent then this Agreement will be binding on such authorized assignee, transferee, sublicensee or agent but will not release Station of any of its obligations under this Agreement.

B. Warner may assign, transfer or sublicense any of its rights under this Agreement, but no such assignment, transfer or sublicense relieves Warner of its obligations.

### 20. MISCELLANEOUS PROVISIONS.

A. In conflicts between any term of this Agreement and any material law, ordinance, rule or regulation, the latter will prevail.

B. No waiver of any breach will be a waiver of any other breach of the same or any other provision. No waiver is effective unless in writing.

C. All remedies are cumulative, and resort to one will not preclude resort to any other at any time.

D. All notices will be in writing and sent to the parties at the following addresses:

Station to provide correct address.
Warner Bros. Domestic Television Distribution
4000 Warner Boulevard
Triangle Building
Burbank, CA 91522
Attention: Brad Hornor

All payments required hereunder will be made as specified in the Agreement.

E. This Agreement contains the entire understanding of the parties regarding its subject matter and supersedes all previous written or oral understandings or representations between the parties if any.

F. This Agreement will be construed under and governed (1) by the internal laws of the State of California applicable to contracts entered into therein without giving effect to its conflicts of the law provisions and (2) by the laws of the United States of America to the extent that those laws preempt California State law.

G. Any action or proceeding based upon or arising out of this Agreement shall be prosecuted only in the Courts of the State of California or the United States District Court for the Central District of California and for such purpose Station constitutes and appoints the Secretary of State of the State of California or the United States Marshal for the Central District of California as its agent to receive service of any and all process in any such action or proceeding.

In order for this Agreement, or any amendment or modification of it, to be binding upon Warner, it must be in writing and signed by both parties.

## Syndex Rider

This Syndex Rider is attached to and forms a part of the agreement dated May 25, 2000, contract # DC 00138 ("Agreement") between Warner Bros. Domestic Television Distribution, a division of Time Warner Entertainment Company, L.P. ("Licensor") and Fireweed Communications Corp., licensee of television station KYES ("Licensee") with respect to "THE DREW CAREY SHOW" ("Series").

Term of License:  September 9, 2002 - September 3, 2006

Licensee shall, by the terms of this Agreement, be entitled to invoke the protection against duplication of programming imported under Compulsory Copyright License, as provided in Section 76.101 of the FCC Rules, and under Statutory Copyright License, as provided in Section 76.123 of the FCC Rules (collectively, "Syndex"). Notwithstanding the foregoing, Licensee does not have the right to invoke Syndex against any broadcasts and/or cablecasts of the Series by WTBS.

Signed this ___6ᵗʰ___

day of ___March___     ___2003___.

Fireweed Communications Corp.
       (Licensee)

By: ___Carol Schratz___

Its: ___GM___

Warner Bros. Domestic Television Distribution,
a division of Time Warner Entertainment
Company L.P.
              (Licensor)

By: _____
         Roxanne Madjallal
Its: Vice President, Finance

2