Michael Jungreis
HARTIG RHODES HOGE & LEKISCH
717 K Street
Anchorage, AK 99501
Telephone: 907-276-1592
Facsimile: 907-277-4352
E-Mail: Michael.jungreis@hartig.com

Attorneys for Defendant
Fireweed Communications Corporation

UNITED STATES DISTRICT COURT
DISTRICT OF ALASKA

| | | |
|---|---|---|
| WARNER BROS. DOMESTIC TELEVISION DISTRIBUTION, A division of WARNER BROS. TELEVISION DISTRIBUTION, INC. A Delaware Corporation, | ) ) ) ) ) | Case No. 3:06-cv-00074-TMB |
| Plaintiffs, | ) ) ) ) | |
| vs. | ) ) ) | |
| FIREWEED COMMUNICATIONS CORPORATION, an Alaska Corporation, | ) ) ) ) | **OPPOSITION TO MOTION TO DISMISS DEFENDANT'S COUNTERCLAIMS** |
| Defendant. | ) ) ) | |

Warner Brothers' motion to dismiss takes the position that unless Fireweed includes with its counterclaim every individual fact it needs to prove at trial, the claims are defective. Warner Brothers is mistaken in the pleading. There is no need to lay out every fact that will be introduced into evidence. Warner Brothers also fails to notice allegations that were made, and also attempts to smuggle its own contrary facts into the motion. Although the

HARTIG RHODES HOGE & LEKISCH, P.C. ATTORNEYS AT LAW 717 K STREET ANCHORAGE, ALASKA 99501-3397 TELEPHONE: (907) 276-1592 FAX: (907) 277-4352

many arguments (none meritorious) in its motion must be individually discussed, these are the common threads that run through its assertions.

For example, in support of its antitrust claims Fireweed alleges that Warner Brothers has the requisite market power. Warner Brothers alleges Fireweed's claim must fail because "Fireweed has utterly failed to allege what percentage of the syndicated television programming market 'Friends' commands." Mot. to Dismiss at p 16. Fireweed need not allege a specific percentage of market share in its counterclaim. Evidence of market share will be developed by expert witnesses and presented at trial.

Warner Brothers suggests that Fireweed must meet its trial burden at the complaint stage in order to survive a motion to dismiss. In truth, a claimant will survive a motion to dismiss where, assuming all facts in favor of the non-moving party, it appears beyond doubt that claimant can establish a set of facts to support its claim. Fireweed's allegations meet such a standard and Warner Brothers' Motion to Dismiss fails.

## **STATEMENT OF FACTS**

The following statement of facts is taken from the allegations of the counterclaims and from public records. The Court may consider matters of public record in determining a Rule 12(b)(6) motion, *Gemtel Corp. v. Community Revdevelopment Agency of Los Angeles*, 23 F.3d 1542 (9th Cir. 1994); and may additionally consider matters of which it can take judicial notice. 5B Charles Alan Wright & Arther R. Miller, *Federal Practice and Procedure* §1357 at 376 (3rd ed. 2004).

HARTIG RHODES
HOGE &
LEKISCH, P.C.
ATTORNEYS AT LAW
717 K STREET
ANCHORAGE,
ALASKA
99501-3397
TELEPHONE:
(907) 276-1592
FAX:
(907) 277-4352

Times Warner, the parent of the specific corporate plaintiff and the other related entities involved in this matter,[1] is a leading media corporation.  Its Warner Brothers' subsidiaries are among the world's largest producers of television programming.[2]  Its cable television subsidiary "is the second largest operator of cable systems in the U.S. in terms of subscribers served."[3]

Its "WB 100-Plus" network is also a subsidiary of Times Warner, according to its latest 10-K filing with the Securities and Exchange Commission.[4]  WB 100-Plus contracts with programming syndicators to obtain programming for its affiliated stations in the television markets in this country that are smaller than the top one hundred markets. [Counterclaim ¶7]  Anchorage falls into that category.  However, during times relevant to the counterclaim, the WB 100-Plus network lacked an Anchorage affiliate.  [Counterclaim ¶ 10]

Fireweed Communications, which operates KYES, Channel 5, in Anchorage, contacted Warner Brothers and other syndicators to obtain programming.  The third party syndicators had entered into contracts with WB 100-Plus that forbade them from selling programming to any station in the smaller television markets, including Anchorage, even though there was no 100-Plus station in Anchorage.  [Counterclaim ¶¶ 9, 11]    Fireweed

HARTIG RHODES
HOGE &
LEKISCH, P.C.
ATTORNEYS AT LAW
717 K STREET
ANCHORAGE,
ALASKA
99501-3397
TELEPHONE:
(907) 276-1592
FAX:
(907) 277-4352

---

[1]  Warner Bros. Television Distribution Inc., the plaintiff, along with its various sister corporations that are related to this matter such as Warner Bros. Television Production Inc. are listed as subsidiaries of Time Warner Inc. in its 2005 10-K filing, filed as a public document with the Securities and Exchange Commission.  Exhibit 21 of that filing, containing a list of Times Warner Subsidiaries, is attached as Exhibit A.  SEC Accession No. **0000950144-06-001556** , filed February 27, 2006, accessed through the EDGAR database accessed at http://sec.gov/edgar/searchedgar/companysearch.html on July 5, 2006 (henceforth "Time Warner 2005 10-K filing").

[2]  2005 10-K at 12, attached as Exhibit B.

[3]  2005 10-K filed with the SEC, at 5, attached as Exhibit B.

[4]  2005 10-K, Exhibit 21, copy attached as Exhibit A.

was therefore shut out from purchasing these desirable television shows, and Anchorage viewers were denied the opportunity to view these programs. [Counterclaim ¶¶ 12, 15]

In 2000, Fireweed negotiated with Warner Brothers to purchase rights to show reruns of the very popular television program, Friends. [Appendix B to Motion to Dismiss] Warner Brothers indicated to Fireweed that it would not sell Friends to Fireweed unless Fireweed also purchased the much less popular show, The Drew Carey Show, which Fireweed did not want to purchase. [Counterclaim ¶¶ 4, 18] Fireweed was then compelled, because of its need to obtain the popular Friends program, to agree to purchase Drew Carey on Warner Brothers' terms. [Counterclaim ¶¶ 4, 20] Warner Brothers drew up the contracts and sent them simultaneously to Fireweed (they are both dated May 25, 2000), including in the Drew Carey contract a provision (special provision H) that it was only to be effective if Warner Brothers licensed Friends to Fireweed.

A reasonable inference, drawn in favor of Fireweed as this Court must, is that Fireweed wanted special provision H to ensure that it would not get stuck with Drew Carey, the undesirable program, unless it also got the desirable program Friends.

A reasonable inference from the Counterclaim is that a substantial part of the value of the syndication agreements was their exclusivity provisions. Local televisions stations gain their revenue from local advertisers. The fees for advertising depend on the number of viewers. The easier it is for viewers to find alternate sources to view their favorite programs, the less likely it is that they will watch the program on Channel 5, thus diminishing the revenues to be obtained from the purchase of the syndicated programming.

HARTIG RHODES
HOGE &
LEKISCH, P.C.
ATTORNEYS AT LAW
717 K STREET
ANCHORAGE,
ALASKA
99501-3397
TELEPHONE:
(907) 276-1592
FAX:
(907) 277-4352

When the revenue to be obtained through the programming declines, the value of that programming declines. When Warner Brothers makes available to Anchorage viewers more and different ways to watch Friends, the value of Fireweed's contract to televise Friends episodes declines. When Friends is run on other local channels that compete with Fireweed, the value declines even more, because advertisers wishing to place their commercials during a Friends episode may go to the competitor. That is inferentially the reason for the exclusivity clauses in the contracts between Warner Brothers and Fireweed.

Paragraph G of the Friends and Drew Carey Agreements entitles Fireweed to syndication exclusivity rights, and refers to Exhibits A and B of the Agreements. Exhibit A, paragraph 18(ii), provides that Warner Brothers will not license any episode for local origination cablecasting to any local cable system located Fireweed's market. Paragraph 18 excepts from this exclusivity cable or broadcasts of the "superstation" WTBS.

A superstation is a television broadcast station, other than a network station, that is secondarily transmitted. 17 U.S.C. §119(d)(9). WTBS is a broadcast station in Atlanta, Georgia. For superstations such as WTBS, FCC regulations prohibit the local cable provider from removing any part of the signal, either the programming or the commercials. *Capital Cities Cable v. Crisp*, 467 U.S. 691, 706 (1984). Therefore, if WTBS is to be run at all in Anchorage, it would be impossible to remove any of the syndicated programming, such as Friends, from its schedule. On the other hand, WTBS' significance as a competitor is diminished because its use of Atlanta, rather than Anchorage, local advertising, local news and local weather cannot be altered. Local Anchorage advertisers cannot purchase air time on WTBS.

HARTIG RHODES
HOGE &
LEKISCH, P.C.
ATTORNEYS AT LAW
717 K STREET
ANCHORAGE,
ALASKA
99501-3397
TELEPHONE:
(907) 276-1592
FAX:
(907) 277-4352

In a further section of paragraph 18, the agreement specifies that episodes may be licensed in Anchorage for any means of transmission except free broadcast, "but only" on a pay-per-view basis.

Exhibit B to the contract[5] further reinforces the exclusivity, by granting Fireweed the right to invoke "Syndex," (referring to 47 CFR §76.151). That regulatory provision, as of May, 2000, provided:

> Upon receiving notification pursuant to § 76.155, a cable community unit located in whole or in part within the geographic zone for a syndicated program, the syndicated exclusivity rights to which are held by a commercial television station licensed by the Commission, shall not carry that program as broadcast by any other television signal, except as otherwise provided below.

Again, WTBS is excepted from this "Syndex" provision in Exhibit B.

Having been forced to purchase a program it did not want, Fireweed was then besieged with double and triple billings by Warner Brothers, which demanded payments that were confusing and, Fireweed believes, far in excess of what was required under the contract. Answer ¶ 13, Affirmative Defense ¶ 3.

After the contract was entered into, and Fireweed committed to running and paying for what were then valuable episodes of Friends and less-valuable episodes of Drew Carey, Warner Brothers licensed Friends to run in Anchorage on TBS. [Counterclaim ¶ 31] TBS is operated by a Time Warner subsidiary that is, therefore, an affiliated entity to Warner Brothers, and is described by Time Warner as an entertainment cable network that reaches

HARTIG RHODES
HOGE &
LEKISCH, P.C.
ATTORNEYS AT LAW
717 K STREET
ANCHORAGE,
ALASKA
99501-3397
TELEPHONE:
(907) 276-1592
FAX:
(907) 277-4352

---

[5] Exhibit B to the Friends Agreement contains a handwritten date in 2002. That date is probably a typographical error, because Exhibit B is specifically referred to and incorporated into the main body of the Agreement (at paragraph G), which is from May of 2000.

89.5 million U.S. households.[6]   TBS is carried in Anchorage as cable channel 33.[7]   TBS is an entity entirely different from Atlanta broadcast superstation WTBS.  Counterclaim ¶ 31.

If permitted to present evidence of damage, Fireweed would also point out other ways in which the licensing of Friends to TBS to run in Anchorage is more damaging than the use of Friends by WTBS.  For example, that TBS in Anchorage carries local advertising, and therefore unlike WTBS is a direct competitor of Fireweed; and that WTBS runs on Eastern time, with a schedule inconvenient in Anchorage, whereas TBS runs on local time.

Fireweed can show and the Court can take judicial notice that a TBS is distributed locally by GCI Cable, a local cable provider with local content.   Fireweed therefore maintains that TBS is "local origination cable" and proscribed by the contract; that additionally it is in violation of Fireweed's Syndex rights and therefore proscribed separately by the contract on that basis, and that it is not pay per view, and therefore proscribed by the contract on that third basis.

## DISCUSSION

### I.     CIVIL RULE 8(a)

Federal Rule of Civil Procedure 8 sets forth the general rules of pleading.   "A pleading [counterclaim], which sets forth a claim for relief…shall contain (1) a short and plain statement of the claim showing that the pleader is entitled to relief…"  Fed. R. Civ. P. 8(a).  The function of the pleading is to give "the opposing party fair notice of the nature and basis or grounds of the pleader's claims and a general indication of the type of

**HARTIG RHODES HOGE & LEKISCH, P.C.**
**ATTORNEYS AT LAW**
**717 K STREET**
**ANCHORAGE,**
**ALASKA**
**99501-3397**
**TELEPHONE:**
**(907) 276-1592**
**FAX:**
**(907) 277-4352**

---

[6]  Time Warner 2005 10-K filing, at page 14.
[7]  The TBS listing is carried every day in the Anchorage Daily News, and a matter as to which this Court may take judicial notice.  The Court can consider judicially noticed facts in a 12(b)(6) motion.

litigation that is involved…" 5 Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure*, §1215, 173 (3d ed. 2004).

> It was the design of the rulemakers that the discovery procedures should give the parties an opportunity for securing an elaboration of the allegations and that process and not the pleadings bears the burden of filling in the details of the dispute for the parties and the court. In federal practice, the test of a complaint's sufficiency simply is whether the document's allegations are detailed and informative enough to enable the defendant to respond.

*Id.* at 174, 190, 193.

The Supreme Court has held that Civil Rule 8(a) requires, as the rule states, "a short and plain statement of the claim showing that the pleader is entitled to relief." *Leatherman v. Tarrant County Narcotics Intelligence & Coordination Unit*, 507 U.S. 163, 168 (1993) citing *Conley v. Gibson*, 355 U.S. 41, 47 (1957). "The Federal Rules of Civil Procedure do not require a claimant to set out in detail the facts upon which he bases his claim." *Id.* quoting *Conley*, 355 U.S. at 47. The Supreme Court states:

> This simplified notice pleading standard relies on liberal discovery rules and summary judgment motions to define disputed facts and issues and to dispose of unmeritorious claims. 'The provisions for discovery are so flexible and the provisions for pretrial procedure and summary judgment so effective, that attempted surprise in federal practice is aborted very easily, synthetic issues detected, and the gravamen of the dispute brought frankly into the open for inspection of the court.'

*Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 512-13 (2002) quoting 5 Wright & Miller, *Federal Practice and Procedure*, §1202, 76 (2d ed.1990). Under the federal rules notice requirements, Fireweed need not plead all of the facts it intends to prove at trial to support its claims.

## II.    CIVIL RULE 12(b)(6)

Federal Rule Civil Procedure 8(a) requires that a counterclaim set forth "a short and plain statement of the claim showing that the pleader is entitled to relief…" Claims need

HARTIG RHODES
HOGE &
LEKISCH, P.C.
ATTORNEYS AT LAW
717 K STREET
ANCHORAGE,
ALASKA
99501-3397
TELEPHONE:
(907) 276-1592
FAX:
(907) 277-4352

not be alleged with particularity unless the pleader makes averments of fraud or mistake. Fed. R. Civ. P. 9(b). "The [counterclaim] need not set out the facts in detail; what is required is a 'short and plain statement of the claim showing that the pleader is entitled to relief.'" *Knevelbaard Dairies v. Kraft Foods, Inc.*, 232 F.3d 979, 984 (9th Cir.2000) *citing* Fed. R. Civ. P. 8(a); *La Salvia v. United Dairymen*, 804 F.2d 1113, 1116 (9th Cir.1986). Antitrust cases are no different.

> Antitrust cases are not to be judged by a higher or different pleading standard than other cases. An antitrust plaintiff "need only allege sufficient facts from which the court can discern the elements of an injury resulting from an act forbidden by the antitrust laws."

*Knevelbaard*, 232 F.3d at 984 *quoting Cost Management Servs., Inc. v. Washington Natural Gas Co.*, 99 F.3d 937, 950 (9th Cir.1996). In deciding a Rule 12(b)(6) motion, the court is not concerned with which party will ultimately prevail at trial or whether the claimant's claims will survive a motion for summary judgment. *Knevelbaard*, 232 F.3d at 994. A motion to dismiss for failure to state a claim "tests only whether the [counterclaims'] allegations are such that a set of facts within their scope could entitle the [claimant] to relief." *Id.*

"[T]he issue is not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims." *Todd v. Exxon Corp.*, 275 F.3d 191, 198 (2nd Cir.2001) *quoting Scheuer v. Rhodes*, 416 U.S. 232, 236 (1974).

### A. Federal Rule Civil Procedure 12(b)(6): Motions to Dismiss Generally.

A party may move "to dismiss for failure of the pleading to state a claim upon which relief can be granted…" Fed. R. Civ. P. 12(b)(6). In general, the Ninth Circuit courts disfavor Rule 12(b)(6) dismissals. *See e.g., Smilecare Dental Group v. Delta Dental Plan of California, Inc.*, 88 F.3d 780, 783 (9th Cir.1996) citing *Everest & Jennings v. American Motorists*

HARTIG RHODES
HOGE &
LEKISCH, P.C.
ATTORNEYS AT LAW
717 K STREET
ANCHORAGE,
ALASKA
99501-3397
TELEPHONE:
(907) 276-1592
FAX:
(907) 277-4352

*Ins. Co.*, 23 F.3d 226, 229 (9th Cir.1994).  A motion to dismiss shall not be granted where all elements of a claim have been alleged.  *See Smilecare Dental*, 88 F.3d at 786; *Les Shockley Racing, Inc. v. National Hot Rod Assn.*, 884 F.2d 504, 507-08 (9th Cir.1989); *Rutman Wine Co. v. E. & J. Gallo Winery*, 829 F.2d 729, 732, 736 (9th Cir.1987).  In each of these cases where the Ninth Circuit Court affirmed a Rule 12(b)(6) dismissal of an antitrust claim, the plaintiff failed to plead an essential element of the claim.

For example, in *Les Shockley* the plaintiff alleged a relatively novel "monopsony" theory, under which the market impact of the defendant's actions was unclear.  The Court affirmed the lower court's dismissal for failure to allege facts that if established would show injury to competition in the market, an essential element under rule of reason analysis Sherman Act § 1.  884 F.2d at 507-08.  In *Rutman Wine* the Court affirmed the lower court's dismissal for failure to allege defendant possessed market power in the relevant geographical market, an essential element of a monopolization claim.[8]  829 F.2d at 736.  And in *Smilecare Dental*, the Court affirmed the lower court's dismissal for failure to allege a conspiracy between defendant and other parties, an essential element of the anti-competitive claim before the court.  88 F.3d at 786.

A Rule 12(b)(6) "[d]ismissal can be based on [1] the lack of a cognizable legal theory or [2] the absence of sufficient facts alleged under a cognizable legal theory."  *Balistreri v. Pacifica Police Dept.*, 901 F.2d 696, 699 (9th Cir.1988).  Warner Brothers' Motion to Dismiss is based on its belief that Fireweed has failed to allege either a "cognizable legal theory" or "sufficient facts alleged under a cognizable legal theory."  Mot. to Dismiss at p 8.

HARTIG RHODES
HOGE &
LEKISCH, P.C.
ATTORNEYS AT LAW
717 K STREET
ANCHORAGE,
ALASKA
99501-3397
TELEPHONE:
(907) 276-1592
FAX:
(907) 277-4352

---

[8] Warner Brothers claims that Fireweed has failed to allege; (1) that Warner Brothers has the requisite percentage of market share; (2) that the tying product has the requisite percentage of market power in the relevant product market; and (3) the relevant geographic market.  Mot. to Dismiss at pp 13, 16, 24.

However, Warner Brothers does not actually appear to contest the validity of federal and state antitrust claims, state breach of contract claims, state unfair trade practices claims and state interference with prospective economic advantage claims. Rather, it appears Warner Brothers' Motion is based on its belief that Fireweed has failed to allege sufficient specific facts to prove any of those cognizable legal theories.

1. *Surviving a Rule 12(b)(6) Motion to Dismiss: Generally*

In reviewing a motion to dismiss, the Court has to accept as true all well-pleaded allegations in the counterclaims and shall consider those facts in the light most favorable to the non-moving party.[9] *Marder v. Lopez*, 2006 U.S. App. LEXIS 14330, **2-4 (9th Cir. June 12, 2006); *Smilecare Dental*, 88 F.3d at 782-83. In order to prevail on a motion to dismiss the moving party must establish that "it appears beyond doubt that [claimant] can prove no set of facts to support [its] claims." *Marder*, 2006 U.S App. LEXIS at **4-5; *Smilecare Dental*, 88 F.3d at 783; *Everest & Jennings*, 23 F.3d at 228. In antitrust cases a Rule 12(b)(6) dismissal is appropriate only where "the complaint states no set of facts which, if true, would constitute an antitrust offense, notwithstanding its conclusory language regarding the elimination of competition and improper purpose." *Smilecare Dental*, 88 F.3d at 783, *quoting Rutman Wine*, 829 F.2d at 735.

Warner Brothers claims that Fireweed's counterclaims should fail because Fireweed pleads legal conclusions. *See e.g.*, Mot. to Dismiss at p.8. However, "the federal rules do not prohibit the pleadings of facts or legal conclusions as long as fair notice is given to the parties." 5 Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 1218 at

HARTIG RHODES
HOGE &
LEKISCH, P.C.
ATTORNEYS AT LAW
717 K STREET
ANCHORAGE,
ALASKA
99501-3397
TELEPHONE:
(907) 276-1592
FAX:
(907) 277-4352

---

[9] Warner Brothers appears to take issue with Fireweed's allegations that Warner Brothers has market power. However, Warner Brothers first alleged it had market power in its complaint at paragraph 5.

267 (3d. ed West 2004). More than fifty years ago the Supreme Court held that allegations of fact and conclusions of law must be considered when deciding whether the case should be dismissed for failure to state a claim. *Id.* citing *United States v. Employing Plasterers' Assn. of Chicago*, 347 U.S. 186 (1954). The Supreme Court wrote:

> The complaint plainly charged several times that the effect of all these local restraints was to restrain interstate commerce. Whether these charges be called "allegations of fact" or "mere conclusions of the pleader," we hold that they must be taken into account in deciding whether the Government is entitled to have its case tried.
>
> \* \* \*
>
> The Government's complaint may be too long and too detailed in view of the modern practice looking to simplicity and reasonable brevity in pleading. It does not charge too little. It includes every essential to show a violation of the Sherman Act. And where a bona fide complaint is filed that charges every element necessary to recover, summary dismissal of a civil case for failure to set out evidential facts can seldom be justified.

*Employing Plasterers'*, 347 U.S. at 188-89. The Ninth Circuit has adopted this liberal pleading standard. *See e.g.*, *Ascon Properties, Inc. v. Mobil Oil Co.,* 866 F.2d 1149, 1155 (9th Cir. 1989).

### 2. *Surviving a Rule 12(b)(6) Motion to Dismiss: Antitrust Claims*

Antitrust claims are generally not susceptible to Rule 12(b)(6) dismissals for failure to delineate an appropriate market because such claims are deeply fact-intensive. *See e.g.,*[10] *Found. For Interior Design Educ. Research v. Savannah Coll. Of Art & Design*, 244 F.3d 521, 531 (6th Cir.2001)("Market definition is a highly fact-based analysis that generally requires discovery.")(citing *Eastman Kodak Co. v. Image Technical Servs., Inc.*, 504 U.S. 451, 482, 119 L.Ed.2d 265, 112 S.Ct. 2072 (1992)); *Double D Spotting Serv., Inc. v. Supervalu, Inc.*, 136 F.3d

HARTIG RHODES
HOGE &
LEKISCH, P.C.
ATTORNEYS AT LAW
717 K STREET
ANCHORAGE,
ALASKA
99501-3397
TELEPHONE:
(907) 276-1592
FAX:
(907) 277-4352

---

[10] As stated in *Todd*, 275 F.3d at 199-200.

Case No. 3:06-cv-00074-TMB
Page 12 of 38

554,560 (9th Cir.1998)(noting that courts are hesitant to dismiss antitrust actions before the parties have had an opportunity for discovery); *Queen City Pizza, Inc. v. Domino's Pizza, Inc.*, 124 F.3d 430, 436 (3d Cir.1997)(explaining that "in most cases, proper market definition can be determined only after a factual inquiry into the commercial realities faced by consumers")(citing *Eastman Kodak*, 504 U.S. at 482); *cf. Hayden Publ'g Co. v. Cox Broad. Corp.*, 730 F.2d 64, 70 n.8 (2nd Cir.1984)("The conclusion that genuine issues of material fact preclude a finding as to [the] relevant market as a matter of law is unexpected.  It frequently has been observed that 'a pronouncement as to market definition is not one of law, but of fact…')(citations and alternations omitted).  The Supreme Court has stated that "dismissals prior to giving the [claimant] ample opportunity for discovery should be granted sparingly." *Hospital Building Co. v. Trustees of Rex Hospital*, 425 U.S. 738, 746 (1976).

To determine the relevant product market, an essential element of an antitrust claim, the court must analyze the cross-elasticity of demand.  *United States v. E.I. du Pont de Nemours & Co.*, 351 U.S. 377, 380 (1956).  In order to determine the relevant product market, the court must determine the availability of alternative commodities for buyers.  *Id.*  This analysis "depends on how different from one another are the offered commodities in character or use, how far buyers will go to substitute one commodity for another." *Id.* at 393.  The relevant product market must be analyzed on a case-by-case basis.  *Id.* at 395.

Defining the relevant product market is, thus, a "deeply fact-intensive inquiry" and for this reason, courts are reluctant to grant motions to dismiss for failure to allege a relevant product market.  *Todd*, 275 F.3d at 199-200; *See also, New York Jets LLC v. Cablevision Systems Corp.*, 2005 U.S. Dist. 23763, *15 (S.D.N.Y. Oct. 18, 2005).  The same is true for the

HARTIG RHODES
HOGE &
LEKISCH, P.C.
ATTORNEYS AT LAW
717 K STREET
ANCHORAGE,
ALASKA
99501-3397
TELEPHONE:
(907) 276-1592
FAX:
(907) 277-4352

relevant geographic market. *See New York Jets*, 2005 U.S. Dist. 23763 at *17. The New York Court found that "[t]he interchangeability of alternative venues is too fact-intensive an inquiry to appropriately resolve at this [12(b)(6)] stage of the proceedings." *Id.* at **17-18.

The Ninth Circuit agrees that defining the relevant product and geographic markets are fact intensive. *See Case-Swayne Co., Inc. v. Sunkist Growers, Inc.*, 369 F.2d 449, 454 (9th Cir.1966), rev'd on other grounds, 389 U.S. 384 (1967)(adopting U.S. Supreme Court criteria for defining both markets as stated in *Brown Shoe Co. v. United States*, 370 U.S. 294 (1962).

### 3. Admissible Evidence

As a general rule, motions to dismiss must be based on the allegations in the claim. *Marder*, 2006 U.S. App. LEXIS at *5. However, a court may consider documents on which the claim "necessarily relies" if:

> (1) the [claim] refers to the document; (2) the document is central to the [claimant's] claim; and (3) no party questions the authenticity of the copy attached to the 12(b)(6) motion. The court may treat such a document as "part of the [claim], and thus may assume that its contents are true for purposes of a motion to dismiss under Rule 12(b)(6)."

*Id.* (internal citations omitted) quoting *United States v. Ritchie*, 342 F.3d 903, 908 (9th Cir.2003). The documents at issue here are three contracts between Fireweed and Warner Brothers attached as Appendices A-C of Warner Brothers' Motion to Dismiss.[11] Fireweed does not dispute authenticity of these three contracts nor does Fireweed dispute their

HARTIG RHODES
HOGE &
LEKISCH, P.C.
ATTORNEYS AT LAW
717 K STREET
ANCHORAGE,
ALASKA
99501-3397
TELEPHONE:
(907) 276-1592
FAX:
(907) 277-4352

---

[11] As will be discussed in Section 3, Fireweed disputes the use of Appendix D (WB 100-Plus Agreement).

centrality to Fireweed's counterclaims. Fireweed does, however, dispute Warner Brothers' interpretation of the contracts.

## III.   "FACTS" WARNER BROTHERS SEEKS TO INTRODUCE AS EVIDENCE IN ITS MOTION TO DISMISS.

Despite Warner Brothers' accurate recitation of the permissible evidence this Court may consider in a Rule 12(b)(6) motion to dismiss, Warner Brothers attempts to introduce a number of "facts" that are not set forth in Fireweed's Counterclaims. Warner Brothers also introduces allegations that are internally inconsistent. As discussed in Section 1 of this Opposition, in deciding this motion the Court may only consider those allegations set forth in Fireweed's Counterclaims. Furthermore, Warner Brothers' allegations demonstrate that determinations of relevant market are highly factual. For the Court's convenience, Fireweed has set forth below the "facts" Warner Brothers seeks to introduce.

- Warner Brothers alleges that Fireweed negotiated with Warner Brothers to make its "The Drew Carey Show" offer contingent upon Warner Brother's acceptance of its "Friends" offer. Mot. to Dismiss at pp 4-5.

- Warner Brothers alleges that its contract with the WB 100+ Network is an example of a third party contract and does not contain an exclusivity clause.[12]  *Id.* at 6.

- Warner Brothers alleges that all syndicated television programming is fungible. *Id.* at p 15.

- Warner Brothers alleges that the relevant product market is all syndicated television programming. *Id.* at pp 13, 15.

HARTIG RHODES
HOGE &
LEKISCH, P.C.
ATTORNEYS AT LAW
717 K STREET
ANCHORAGE,
ALASKA
99501-3397
TELEPHONE:
(907) 276-1592
FAX:
(907) 277-4352

---

[12] The WB 100-Plus Network and Warner Brothers are related entities and Appendix D is not an independent third party contract. See Section IV.

## IV.    THIS COURT MAY NOT CONSIDER WARNER BROTHERS' APPENDIX D.

Fireweed concedes that Appendices A-C are integral to its claims and does not dispute their authenticity.[13]   Fireweed does vigorously contest Warner Brothers' interpretation of those contracts and, as previously discussed, is entitled to present extrinsic evidence as to their meaning.

But as stated in Section IIA3, a court may consider documents on which a counterclaim "necessarily relies" if:

> (1) the [counterclaim] refers to the document; (2) the document is central to the [claimant's] claim; and (3) no party questions the authenticity of the copy attached to the 12(b)(6) motion.

Marder, 2006 U.S.App. LEXIS at *5.   Correspondingly, the court may not consider a document on which a counterclaim "necessarily relies" if (1) the counterclaim does not refer to the document; (2) the document is not central to the claimant's claim; or (3) a party disputes the authenticity of the copy attached to the 12(b)(6) motion.

In its Motion to Dismiss, Warner Brothers attempts to rely on a "third-party syndicator contract" attached to its motion as Appendix D ("WB 100-Plus Contract").   Fireweed denies (1) that its counterclaim refers to this contract; (2) that the contract is central to Fireweed's claim; and (3) that the contract is authentic.  Fireweed has never seen this contract, did not attach it to its counterclaim, and did not cite to or reference it in its counterclaim.  Warner Brothers' unverified statement in the motion that it is an "example of a contract by which

HARTIG RHODES
HOGE &
LEKISCH, P.C.
ATTORNEYS AT LAW
717 K STREET
ANCHORAGE,
ALASKA
99501-3397
TELEPHONE:
(907) 276-1592
FAX:
(907) 277-4352

---

[13]    Appendix A is the "Drew Carey Agreement" dated May 25, 2000.  Appendix B is the "Friends I Agreement" dated May 25, 2000.  Appendix C is the Friends II Agreement" dated May 20, 2002.

[Warner Brothers] licenses content to the WB 100-Plus Network" is insufficient to establish its authenticity.

Furthermore, the WB 100-Plus Contract is irrelevant to the allegations in Fireweed's Counterclaims. Fireweed's counterclaims involve the improper and illegal actions of Warner Brothers between 1999 and July 2004. The WB 100-Plus Contract commences in September 2005, more than a year after Fireweed's last complaint of improper and illegal behavior. And the agreement is unsigned.

In addition, the WB 100-Plus Contract is not a contract with a third-party syndicator as opposing counsel suggests. It is a contract with a subsidiary of Warner Brothers, WeB Broadcasters, Inc. The WB 100+ Contract is not "representative" of a third-party syndicator contract; it is not an arm length's transaction. Even if it is authentic, it does not negate the possibility of additional, supplemental agreements with exclusivity provisions.

## V.  FEDERAL AND STATE ANTITRUST

### A.  The Tying Claim

As Warner Brothers notes, Fireweed has brought a claim against it alleging tying in violation of Section 1 of the Sherman Act. As Warner Brothers further notes, such a claim may be proved either as "per se violation" or under the "rule of reason." The elements of each method of proving a tying claim differ, and so will be analyzed separately.

#### 1.  Per Se Violation

The Ninth Circuit requires four elements to establish a per se illegal tying claim (*County of Tuolumne v. Sonora Cmty. Hosp.*, 236 F.3d 1148, 1157-58(9th Cir. 2001)):

HARTIG RHODES
HOGE &
LEKISCH, P.C.
ATTORNEYS AT LAW
717 K STREET
ANCHORAGE,
ALASKA
99501-3397
TELEPHONE:
(907) 276-1592
FAX:
(907) 277-4352

1.   A tie between two separate products or services sold in relevant markets. Fireweed has alleged the tie (Counterclaims Paragraphs 4, 5, 19) and the relevant markets (Counterclaims Paragraphs 15, 19, 21, 26 ).

2.  Sufficient economic power in the tying product market to affect the tied market. Fireweed has alleged this economic power (Counterclaims Paragraphs 2, 3, 19).

3.  An effect on a not-insubstantial volume of commerce in the tied product market. Fireweed has alleged this effect (Counterclaims Paragraphs 5, 20, 21, 24, 26).

4.  Whether the defendant [in this case Warmer Brothers] has an economic interest in the tied product.   This element is uncontested.  Warner Brothers itself alleged that Fireweed owes it money for the tied product, the Drew Carey program (Complaint Paragraph 8).

Since Fireweed has in fact alleged all the elements of its claim, Warner Brothers attempts, implicitly, to attack the validity of the facts alleged, as though this were a motion for summary judgment or indeed a trial brief.

Its first assertion is that Warner Brothers' copyright does not itself establish market power.  This is a debatable, but ultimately irrelevant, point.  The question at this stage is not how Fireweed will prove Warner Brothers' market power, but only whether that market power has been alleged.   Fireweed did allege market power.  Whether Fireweed can rely on the copyright to show that power, or must use other ways to prove it, is not relevant to whether Fireweed appropriately alleged a tying claim.

Warner Brothers' second assertion is that it "defies common sense to place each syndicated television show in its own product market; syndicated television programming is

HARTIG RHODES
HOGE &
LEKISCH, P.C.
ATTORNEYS AT LAW
717 K STREET
ANCHORAGE,
ALASKA
99501-3397
TELEPHONE:
(907) 276-1592
FAX:
(907) 277-4352

essentially fungible." Mot. to Dismiss at 15. Appeals to common sense are not appropriate at this stage. And even if they were, opposing counsel has not made a common sense suggestion of the relevant product market. Instead, all reasonable inferences from the facts alleged must be taken as true. *See, e.g. Simpson v. AOL Time Warner Inc.,* 2006 U.s. App. LEXIS 16556 (9th Cir. June 30, 2006).

The assertion that syndicated television programming is "fungible" is absurd on its face. "Fungible" as defined in the Uniform Commercial Code (in Alaska at 45.01.201(17)) means "goods or securities of which any unit is, by nature or usage of trade the equivalent of any other like unit." As an Illinois court, noted, "Fungible goods, unlike other goods, are sold not by a description but in quantities by weight, measure, or count; the constituent parts making up the mass being indistinguishable from each other by any physical characteristic." *Servbest Foods, Inc. v. Emessee Industries, Inc.,* 82 Ill. App. 3d 662, 671 (Ill. App. Ct. 1980).

Items that are fungible include: bars of a particular brand of soap, car mats, bottles of Korbel Extra Dry Champagne. *People v. Kmart Corp.,* 259 Cal.Rptr. 59, 62 (Cal.App.1989). Gasoline, on the other hand, is not a fungible good because companies place certain additives to their product in order to distinguish it from other products. *Shell Oil Co. v. A.Z. Services, Inc.,* 990 F.Supp. 1406, 1413 (S.D.Fla.1997).

Is Friends indistinguishable from Drew Carey? Are other syndicated programs, ranging from Seinfeld to M*A*S*H to Mission Impossible to The Brady Bunch all sold not by description but by quantity? Are these different programs indistinguishable from each other by any characteristic? Are situation comedies impossible to tell one from the other?

HARTIG RHODES
HOGE &
LEKISCH, P.C.
ATTORNEYS AT LAW
717 K STREET
ANCHORAGE,
ALASKA
99501-3397
TELEPHONE:
(907) 276-1592
FAX:
(907) 277-4352

Or, for that matter, are situation comedies impossible to tell from dramas or music videos or professional sports? To ask this question is to answer it. Tellingly, Warner Brothers supplies no citations or even argument that syndicated programming is "fungible."

Warner Brothers licensed Friends for $2,500 a week but Drew Carey for $1,500 a week, according to the contracts it attached to its motion. Warner Brothers obviously did not believe the syndicated shows were so similar that they could be substituted for each other. Television programming, like literature or art, is a creative product. Like all creative products there are varying degrees of quality in television programming. To refer to a creative product as "fungible" is to misuse the language.

Warner Brothers then follows up by asking this Court to define the product market, *as a matter of law*, "that the relevant tying product market consists of all syndicated television programming." Mot. to Dismiss at 15. Naturally this invitation, which is vital to its request to dismiss the tying claims, is entirely unsupported by any argument or authority. And, as it happens, it targets a particularly fact-intensive aspect of antitrust litigation - defining the relevant market. See the discussion *supra* at IIA2.

In fact, at least one other federal court faced with a nearly identical case had no difficulty finding that a claim restricting the relevant market to a specific, narrowly defined group of programs is supportable. The very recent *Paramount Pictures Corp. v. Johnson Broadcasting, Inc.*, 2006 U.S. Dist. LEXIS 32039 (S.D. Tex. May 22, 2006) was, exactly like this one, initiated by a syndicator suing a local station for breaching its licensing agreement. Also, exactly like this case, the station counterclaimed for antitrust violations on allegations

HARTIG RHODES
HOGE &
LEKISCH, P.C.
ATTORNEYS AT LAW
717 K STREET
ANCHORAGE,
ALASKA
99501-3397
TELEPHONE:
(907) 276-1592
FAX:
(907) 277-4352

of illegal tying. In that case, the tying (desirable) programs were Judge Judy and Judge Joe Brown, and the tied (undesirable) program was Becker.

There is no indication that the court found the complaint inadequate, although no allegations of specific market share was made, nor were there any specific allegations regarding the contours of the relevant market. See Johnson counterclaims, attached as Exhibit C obtained through PACER. On summary judgment, Johnson presented evidence that the two programs alone, Judge Judy and Judge Joe Brown, in which Paramount held 100% of the market share, comprised the relevant market for the tying product. The court held that this evidence was sufficiently established to constitute a genuine issue of fact regarding the relevant market.

A careful examination of the cases cited by Warner Brothers, such as *Les Schockley*,[14] and *Smilecare*, shows that the flaw in the plaintiffs' cases was not an insufficient level of detail, but rather that the harm complained of was not an antitrust violation.

Another case relied on by Warner Brothers is *Robert's Waikiki U-Drive, Inc. v. Budget Rent-A-Car Systems, Inc.*, 732 F.2d 1403 (9th Cir.1984). That opinion provides poor support for Warner Brothers, because it did not review a motion to dismiss, but rather a motion for summary judgment. For summary judgment, the plaintiff could not rely on the allegations of its complaint, but was required to come forward with evidence to support its allegations.

In *Robert's Waikiki*, there was no lack of detail nor any failure to allege complained-of aspects of the transaction. Roberts, the plaintiff, alleged that a single price for a plane ticket and a car rental was a tying arrangement. *Id.* At 1406. When challenged on summary

HARTIG RHODES
HOGE &
LEKISCH, P.C.
ATTORNEYS AT LAW
717 K STREET
ANCHORAGE,
ALASKA
99501-3397
TELEPHONE:
(907) 276-1592
FAX:
(907) 277-4352

---

[14] See discussion *supra* at IIA.

judgment, Roberts failed to provide evidence of market power. *Id.* At 1408  The court found that Roberts could not support his claim of market power merely by relying on an assertion that discounts on air tickets established market power. *Id.* At 1407.  Roberts also failed to establish coercion, or to show that the defendant benefited from the tied product. *Id.* At 1407-08.

By contrast, in our case the allegation of market power (supported by Warner Brothers' own allegation of its preeminent position as a syndicator of television programming,[15]) cannot be factually challenged in a motion to dismiss, but must be assumed to be true.  The same is true of the claim of coercion.  As to economic benefit from the tied product, that fact is agreed to by Warner Brothers, which was the party to which the syndication fees for the tied product were paid.

Warner Brothers concludes its argument regarding the per se tying claim by asking this Court to hold that it does not have market power "in the syndicated television programming market."  But that is simply not something that the Court can do when the counterclaimant has pled that Warner Brothers does have market power.  Neither should the Court accept the invitation to define the product market as "all syndicated television programming," when such a definition is contrary to the allegations of the counterclaim, unsupported by any legal authority, and contrary to reason.

The failure of Warner Brothers' attack on the per se tying claims of the complaint is sufficient to doom all of Warner Brothers' arguments against the federal and state antitrust counts of the complaint, since they are all logically dependent on that attack.

HARTIG RHODES
HOGE &
LEKISCH, P.C.
ATTORNEYS AT LAW
717 K STREET
ANCHORAGE,
ALASKA
99501-3397
TELEPHONE:
(907) 276-1592
FAX:
(907) 277-4352

---

[15] See Complaint at ¶ 5.

2. *Rule of Reason*

Even if Fireweed does not have a claim for a per se violation, Fireweed may succeed on the alternative theory, rule of reason. Warner Brothers' argument that the complaint fails to make out a rule of reason antitrust case is also flawed. In order to prove a "rule of reason" tying claim, the claimant must show the challenged agreement is one that suppresses competition. *County of Tuolumne v. Sonora Community Hosp.*, 236 F.3d 1148, 1158 (9th Cir. 2001). Contrary to the assertion of Warner Brothers, it is sufficient that the harm to competition affects the claimant alone, if the market is sufficiently small. *Id* at 1159. The Court can take judicial notice of the fact that in Anchorage, there are only seven commercial broadcast television stations, a fact available through the FCC and shown in the newspaper every day. The number of appropriate syndicated television shows comparable to Friends or at any rate better and/or cheaper than Drew Carey might be quite small. Fireweed claims that the tying arrangement makes competing in this limited market more difficult, in paragraph 15. That is sufficient to make out a claim of tying under the rule of reason analysis.

Warner Brothers next asserts that Fireweed's tying claim lacks the necessary element of coercion. This assertion is again a flight beyond the realms of a motion to dismiss. Fireweed has explicitly and repeatedly alleged that Warner Brothers coerced it into the tying arrangement. Counterclaim at ¶¶ 4, 19, 24. Warner Brothers seems to imagine that because the licensing agreements themselves do not contain a reference to coercion, the claim is excluded.

HARTIG RHODES
HOGE &
LEKISCH, P.C.
ATTORNEYS AT LAW
717 K STREET
ANCHORAGE,
ALASKA
99501-3397
TELEPHONE:
(907) 276-1592
FAX:
(907) 277-4352

The fact that the agreement did not contain a clause stating "this agreement is the product of coercion" is not detrimental to Fireweed's claim.  The provision inserted into the Drew Carey agreement that provides that it will be valid only if Warner Brothers agrees to the Friends licensing agreement is entirely consistent with Fireweed's claim of coercion. If Fireweed had no desire to enter into the Drew Carey agreement, and did so only to obtain Friends, it is logical that Fireweed would make the Drew Carey agreement contingent on obtaining the Friends agreement.

But it is entirely consistent with Fireweed's claims of coercion that Warner Brothers conveyed its threat or demand tying Drew Cary to Friends in conversations or some other communication outside the contract.  Certainly a claim of coercion does not require looking within the four corners of a contract.  *See Restatement (Second) of Contracts* §214(d) (1981).  And Fireweed did not allege that the contracts themselves contain the coercive message.

### B. Restraint of Trade

Warner Brothers next argues that the restraint of trade claims regarding its WB 100-Plus Network are inadequate.  Its arguments depend on misstating the allegations of the counterclaims, and on the improper use of a document that the Court cannot consider.

First, Warner Brothers says that Fireweed failed to allege that Warner Brothers is responsible for the exclusivity provisions of its network contracts. Mot. to Dismiss at p 21. Amusingly, on the very next page Warner Brothers contradicts its own statement and concedes that Fireweed *did* allege that Warner Brothers is responsible ("Fireweed only contends that WBDTD was responsible for the exclusivity clauses. . .").

HARTIG RHODES
HOGE &
LEKISCH, P.C.
ATTORNEYS AT LAW
717 K STREET
ANCHORAGE,
ALASKA
99501-3397
TELEPHONE:
(907) 276-1592
FAX:
(907) 277-4352

Paragraph 12 of the Counterclaims states that those provisions were "an illegal attempt to monopolize. . . ." If the word "attempt" means anything, and if the Court is entitled to draw a reasonable inference from that word (which it is), Fireweed was accusing Warner Brothers of responsibility for the exclusivity provisions. That accusation is implicit also in paragraphs 9 and 11.

Next Warner Brothers states that it is implausible that it would purchase programming from third party syndicators. But, a complaint is not subject to dismissal because the Court thinks its allegations are implausible, unlikely, or difficult to believe. As the Ninth Circuit has recently stated regarding a motion under Rule 12(b)(6): "Indeed it may appear on the face of the pleadings that a recovery is very remote and unlikely but that is not the test." *Hearns v. Terhune*, 413 F.3d 1036, 1043 (9th Cir. 2005).

Warner Brothers then points to Appendix D, which purports to be an internal contract between the WB 100-Plus Network and another arm of Times Warner, Warner Bros. Syndication, as to what it claims the actual terms of its network agreements were. As discussed *supra* in Section IV, the Court may not consider this document.

Next, Warner Brothers asserts that Fireweed has failed to allege a combination or conspiracy. Warner Brothers cites *Monsanto Co. v. Spray-Rite Serv. Corp.*, 465 U.S. 752 (1988) for the proposition a claimant must *allege* that participants in a combination in restraint of trade share a conscious commitment to a common scheme designed to achieve an unlawful purpose.

Warner Brothers misrepresents the holding in *Monsanto* in several respects. First, the Supreme Court made a clear distinction at the very outset between price and non-price

HARTIG RHODES
HOGE &
LEKISCH, P.C.
ATTORNEYS AT LAW
717 K STREET
ANCHORAGE,
ALASKA
99501-3397
TELEPHONE:
(907) 276-1592
FAX:
(907) 277-4352

restraints, and in fact pointed out that the lower court had erred by ignoring that distinction, because different elements and standards of proof applied to these two cases. *Id.* At 761-62. Its holding regarding conscious commitment pertained to the price-fixing scenario. No similar holding regarding non-price restrictions (which are at issue in the instant case) was made.

Second, the case discussed only the sufficiency of the evidence actually presented to the jury and not what allegations were necessary to the complaint. Warner Brothers is in error in citing this case in support of its assertion that "Fireweed must allege" a "conscious commitment." What Fireweed must prove at trial is not before the Court on this motion.

Third, and most important, the Supreme Court was commenting not on the elements of price fixing or other restraint of trade, but rather on how such a combination is to be proved. Price fixing conspiracies are not committed to paper. The Court held that in order to prove that there really was an agreement to do this illegal thing, the plaintiff has to show a conscious commitment to it by the participants. *Id.* At 785-86. Such a showing is needed to exclude the possibility that the parties were in fact acting independently and not pursuant to some agreement.

The Court was not holding that every party to a price fixing agreement needs to know that it is illegal to fix prices. The holding was that to prove a combination, it is necessary to prove that each participant knows that it is participating. In the instant case Fireweed has far exceeded the requirements of *Monsanto*, because it alleges not merely conscious commitment to the agreement in question, but actual contracts.

HARTIG RHODES
HOGE &
LEKISCH, P.C.
ATTORNEYS AT LAW
717 K STREET
ANCHORAGE,
ALASKA
99501-3397
TELEPHONE:
(907) 276-1592
FAX:
(907) 277-4352

Warner Brothers next claims that Fireweed has failed to allege harm to competition. In order to make this claim, Warner Brothers has to ignore paragraphs 12 and 15 of the counterclaims, where harm to the market and restraint of trade are alleged, with additional specifics.

Warner Brothers then asserts that inadequately defining a market and showing actual harm to competition in it (by implication in the counterclaim) justifies dismissal. Since it has ignored the explicitly alleged claims of harm to competition in paragraphs 12 and 15 of the counterclaims, this claim is inapposite. Additionally, the authority cited does not support dismissal of a claim on this basis under Rule 12(b)(6).

Several of the cases cited focus not on pleadings but on what must be shown at trial (actual harm to competition). *Business Electronics Corp. v. Sharp Electronics Corp.*, 485 U.S. 717 (1988) falls into this category. That case was tried to a jury, and the Supreme Court found that the jury instructions were incorrect in permitting a finding of *per se* violation. To the extent that the instant case does require a rule of reason finding, Fireweed asks only that it be permitted to make its case of anti-competitive harm to a jury, which is what the Supreme Court held in *Business Electronics*.

Similarly, in *Metro Industries, Inc. v. Sammi Corp.*, 82 F.3d 839 (9th Cir.1996) the court explicitly held that the complaint was adequate, but that when challenged on summary judgment to produce *evidence* of harm to competition in a defined market, the plaintiff could not do so. *Id* at 848. This case does not support a motion to dismiss merely because of insufficient detail concerning markets.

HARTIG RHODES
HOGE &
LEKISCH, P.C.
ATTORNEYS AT LAW
717 K STREET
ANCHORAGE,
ALASKA
99501-3397
TELEPHONE:
(907) 276-1592
FAX:
(907) 277-4352

Other of Warner Brothers' cases, such as *Rutman Wine*, 829 F.2d 729 that do concern 12(b)(6), have nothing to do with inadequate definition, lack of detail, or failure to mention specific topics. Rather, they penetrate to the heart of the claim made and find that the harm complained of is not within the scope of the antitrust laws. For example, *Rutman Wine* concerned a wine wholesaler complaining that Gallo wine stopped selling its product to the wholesaler and instead sold exclusively to a competitor. The court held that this was an injury to Rutman but not to competition generally – there is no antitrust prohibition on refusing to sell to a particular customer. *Id.* at 735-36.

In our case, on the other hand, Fireweed has alleged that Warner Brothers entered into contracts that froze out the entire Anchorage market, including all stations, advertisers, and viewers, from access to certain desirable programs. It was able to do that because of its national cable market power (see *supra* at p 3)

Another cited case that concerns a motion to dismiss is *McGlinch v. Shell Chemical Co.*, 845 F.2d 802 (9th Cir.1998). The facts in *McGlinch* were quite similar to those of *Rutman Wine*. A reseller of various Shell products sued after its contract was terminated, asserting that denial of access to a plastic raw material was a violation of the Sherman Act. The court held that the complaint simply did not show any antitrust violation, since a harm to a competitor was not a harm to competition. *Id.* at 812. Interestingly, the complaint also alleged that Shell had cut all resellers off from being able to purchase certain pipe fittings, but it did not allege that the lack of pipe fittings was the antitrust harm. If it had, the court suggests, its complaint would in fact have been sufficient. 845 F.2d at 812.

HARTIG RHODES
HOGE &
LEKISCH, P.C.
ATTORNEYS AT LAW
717 K STREET
ANCHORAGE,
ALASKA
99501-3397
TELEPHONE:
(907) 276-1592
FAX:
(907) 277-4352

This dovetails with Fireweed's counterclaim, which alleges that the entire Anchorage market was cut off from certain programming through Warner Brothers' anticompetitive acts.

### C. *California Law*

Warner Brother argues that since there is no Sherman Act claim, it follows that there is no Cartwright Act claim. The response is that there is indeed a valid claim stated for illegal tying under the Sherman Act – and since the premise of Warner Brother's proposition is false, its conclusion is necessarily false. The argument thus fails.

Warner Brothers mentions specific "examples" of supposed defects that a California court would find, but its examples are mistaken. It cites *Morrison v. Viacom*, 78 Cal.Rptr.2d 133 (Cal.App.1998) for the proposition that a complaint must allege that the plaintiff would have bought the tied product from another source if not forced to purchase it from the defendant. But that requirement is met by Fireweed's allegation (counterclaim at 15) that if not forced to purchase Drew Carey, "it could have contracted with another distributor for a less expensive and more desirable program." As *Morrison* makes clear, the question is not whether the exact same object would have been purchased, but rather whether competition is harmed because the plaintiff is forced to make one purchase and forego another that would be otherwise more desirable.

Warner Brothers also asserts that there is no allegation that the purchase of the tied product was forced by it. This assertion simply ignores the plain language of the counterclaims in paragraphs 3 ("inflict"), 4 ("required"), 19 ("coerce"), 24 ("forced").

HARTIG RHODES
HOGE &
LEKISCH, P.C.
ATTORNEYS AT LAW
717 K STREET
ANCHORAGE,
ALASKA
99501-3397
TELEPHONE:
(907) 276-1592
FAX:
(907) 277-4352

Again, just because the contract itself does not contain a "coercion" provision does not mean that the coercive message was not delivered by other means.   Not only must the court accept all material allegations in the complaint as true, but the complaint must be construed, and all doubts resolved, in the light most favorable to the plaintiff. *NL Indus., Inc. v. Kaplan,* 792 F.2d 896, 898 (9th Cir. 1986)*; Ernest W. Hahn, Inc. v. Codding,* 615 F.2d 830, 834--45 (9th Cir. 1980).   The allegations of coercion are certainly adequate, and the counterclaim states a claim for relief under California's Cartwright Act.

### D.  Alaska Law

Alaska has a number of statutory provisions prohibiting various kinds of restraints of trade and monopolization.  AS 45.50.562, .564, .566, .568, .570.  These statutes cover the same ground as, and are closely similar to, the federal Sherman and Clayton Acts.    In interpreting these statutes, Alaska is guided by federal Sherman Act cases.  *Sisters of Providence in Wash. v. A.A. Pain Clinic, Inc.,* 81 P.3d 989, 1000 (Alaska 2003).   There can be little doubt that Alaska would treat tying arrangements under its statutes as illegal just as federal courts have found such arrangements to be illegal under the Sherman Act.  Even if the specific statute recited in the counterclaim (AS 45.50.566) is not the one under which Alaska would find such arrangements to be prohibited, there is no doubt that a valid claim under Alaska law has been pled.

## VI.  BREACH OF CONTRACT

Fireweed alleges that Warner Brothers violated the licensing agreements in quite a few ways.  First, Fireweed alleges that Warner Brothers violated the exclusivity provisions

HARTIG RHODES
HOGE &
LEKISCH, P.C.
ATTORNEYS AT LAW
717 K STREET
ANCHORAGE,
ALASKA
99501-3397
TELEPHONE:
(907) 276-1592
FAX:
(907) 277-4352

of Paragraph G and Exhibit A (paragraph 18(ii)) and Exhibit B of the Friends Agreement.[16]

This provision prohibits Warner Brothers from licensing Friends "For local origination cablecasting by any cable television system" in Anchorage." There is an exclusion for WTBS, but none for TBS. As explained in the Fact section above, WTBS and TBS are completely distinct entities, and different in important respects.

Fireweed contends that, as shown in Anchorage, TBS *is a local origination cablecast*. If Fireweed is right, Warner Brothers has violated the contract. Although the following are not specifically alleged in the counterclaim, they are facts that Fireweed is prepared to prove, and believes do not have be specifically set out in a claim that is required by the rule to be "short and plain." Fireweed contends that TBS, as shown in Anchorage on GCI Cable, runs local advertising, and runs Friends at the same time as Fireweed ran it, thus directly competing with both its viewership and its customers (the advertisers). Fireweed contends that this is in contrast to WTBS, the Atlanta superstation, which cannot run any Anchorage local advertising, and because of time differences did not run Friends at a time convenient for most viewers in Anchorage.

Once again, Warner Brothers complains that Fireweed has not specified every detail of its claim, down to the words and phrases of the contract that Fireweed believes were breached. Warner Brothers objects that the entire breach of contract claim must be thrown out because Fireweed did not use the phrase from the contract "local origination cablecasting" in paragraph 31 where it alleged that the cablecast of TBS was in violation of

HARTIG RHODES
HOGE &
LEKISCH, P.C.
ATTORNEYS AT LAW
717 K STREET
ANCHORAGE,
ALASKA
99501-3397
TELEPHONE:
(907) 276-1592
FAX:
(907) 277-4352

---

[16] See Appendix A-C of Warner Brothers' Motion to Dismiss for the Friends and The Drew Carey Show Agreements.

the exclusivity provisions of the agreement – not only the specific prohibition on cablecasting in Exhibit A to the Agreement, but also the Syndex prohibitions of Exhibit B.

That latter provision, as discussed in the facts section above, prohibits a "cable community unit" which Fireweed contends applies to GCI Cable, from carrying a program that is broadcast locally under an exclusivity agreement.  Even further, at the end of paragraph 18 in Exhibit A, the agreement allows licensing of Friends for local showing in Anchorage "but only" as a pay-per-view basis.  Fireweed contendss the phrase "but only" implies that TBS, which is not pay-per-view, may not show Friends.

The Ninth Circuit Court looks to applicable state law to determine whether extrinsic evidence is admissible.  *Barris Industries Inc. v. Worldvision Enterprises, Inc.*, 875 F.2d 1446, 1450 (9th Cir.1989).  Regardless of whether the contracts are interpreted under California law or Alaska law[17], extrinsic evidence should be allowed to explain the meaning of the written contracts.  Under both state's laws extrinsic evidence is always admissible as stated below:

California Standard:

> Under California law, "the test of admissibility of extrinsic evidence is not whether it appears to the court to be plain and unambiguous on its face, but whether the offered evidence is relevant to prove a meaning to which the language of the contract is reasonably susceptible."  Thus, even if a contract appears to be absolutely clear on its face, the court is required to engage in preliminary consideration of extrinsic evidence to see whether it creates an ambiguity.

HARTIG RHODES
HOGE &
LEKISCH, P.C.
ATTORNEYS AT LAW
717 K STREET
ANCHORAGE,
ALASKA
99501-3397
TELEPHONE:
(907) 276-1592
FAX:
(907) 277-4352

---

[17] The Standard Terms and Conditions attached as exhibit A to the Drew Carey and Friends agreements contains a provision stating that California law applies.  On the other hand, the Standard Terms and Conditions are arguably unenforceable and performance of the contracts took place in Alaska, one party has its principal place of business in Alaska, and Warner Brothers arguably waived its rights to enforce the Standard Terms and Conditions by commencing this action in U.S. District Court for the District of Alaska as opposed to the Central District of California as provided in the Standard Terms and Conditions.

*Barris Industries*, 875 F.2d at 1450, quoting *Pacific Gas and Electric Co. v. G.W. Thomas Drayage and Rigging Co.*, 442 P.2d 641, 644 (Cal.1968).

Alaska Standard:

> The goal of contractual interpretation is to give effect to the reasonable expectation of the parties. We consider disputed language in its context in the contract as a whole and look to the purposes of the contract, and the circumstances surrounding its formation, and the case law on similar contractual provisions. The parol evidence rule provides that an integrated contract (one that is intended to describe the entire agreement) cannot be varied through the introduction of evidence about prior negotiations or agreements. However, extrinsic evidence is always admissible on the question of the meaning of the words of the contract itself.

*Casey v. Semco Energy, Inc.*, 92 P.3d 379, 383 (Alaska 2004). "Alaska courts may use extrinsic evidence regarding the intent of the parties 'to interpret a contract regardless of whether the contract appears to be ambiguous on its face or not.'" *Alaska Tae Woong Venture, Inc. v. Westward Seafoods, Inc.*, 963 P.2d 1055, 1067 (Alaska 1998) quoting *Municipality of Anchorage v. Gentile*, 922 P.2d 248, 258-59 (Alaska 1996).

Here, Warner Brothers' seeks to introduce the three contracts and suggests that the documents "speak for themselves." However, Warner Brothers' has presented this Court with a different interpretation of the contracts than Fireweed. Since the parties disagree about the meaning of the contracts, this Court cannot construe them without admitting extrinsic evidence per the above state standards. The parties need time to conduct discovery in order to present extrinsic evidence. It is premature to dismiss Fireweed's claims before it is afforded the opportunity to conduct discovery.

The parties are entitled under both Alaska and California law to introduce extrinsic evidence to explain the meaning of the contract, something that cannot happen at the stage

HARTIG RHODES
HOGE &
LEKISCH, P.C.
ATTORNEYS AT LAW
717 K STREET
ANCHORAGE,
ALASKA
99501-3397
TELEPHONE:
(907) 276-1592
FAX:
(907) 277-4352

of a 12(b)(6) motion. Until then, the complaint must be construed, all doubts resolved, and all reasonable inferences drawn, in favor of Fireweed.

Fireweed has also alleged that Warner Brothers' subsequent release of DVDs, covering the Friends episodes it licensed to Fireweed, was a violation of the implied covenant of good faith and fair dealing in every contract.

> An implied covenant of good faith and fair dealing exists in all contracts and requires that each contracting party refrain from doing anything that would injure the right of the other party to receive the benefits of the agreement.

*Kaiser v. Royal Ins. Co. of Am.,* 89 P.3d 740 (Alaska 2004). In Alaska, the claim of a breach of the covenant of good faith and fair dealing raises an issue of fact for the jury. *Reeves v. Alyeska Pipeline Serv. Co.,* 926 P.2d 1130, 1144 (Alaska 1996). Fireweed contends that Warner Brothers severely injured the benefits of the Friends licensing agreement when it unexpectedly released the Friends series on DVD, with a predictably depressing effect on the viewership, advertising revenue, and value of the licensing agreement.

In its answer, which was incorporated by reference into the breach of contract counterclaim, Fireweed also alleged (Affirmative Defense 3) that Warner Brothers breached the contract by overbilling, by supplying the wrong episodes (Affirmative Defense 9), and by suspending delivery of the syndicated episodes (Affirmative Defense 18).

Under the liberal pleading provisions of the Federal Rules, there can be no question that Fireweed has stated a claim for relief based on breach of contract.

## VII.    CALIFORNIA UNFAIR TRADE PRACTICES

Warner Brothers writes "[i]t is well established that 'laws have no force of themselves beyond the jurisdiction of the State which enacts them, and can have no extraterritorial

HARTIG RHODES
HOGE &
LEKISCH, P.C.
ATTORNEYS AT LAW
717 K STREET
ANCHORAGE,
ALASKA
99501-3397
TELEPHONE:
(907) 276-1592
FAX:
(907) 277-4352

effect only by the comity of other states." Mot. to Dismiss at p 31. Warner Brothers then proceeds to cite a number of federal district court cases from the Middle Districts of North Carolina and Louisiana and the District of Connecticut to support its position that Fireweed's claims under California's statutory Unfair Trade Practices Act must fail. *Id.* at 33. However, these cases interpret the Unfair Trade Practices Acts codified in North Carolina, Louisiana, and Connecticut, not California.

The sole California case on which Warner Brothers relies in its Motion to Dismiss is *Cel-Tech Communications, Inc. v. Los Angeles Cellular Telephone Co.*, 973 P.2d 527 (Cal.1999). But that case concerns §§17043 and 17044 of the Unfair Trade Practices Act, which concern injury to competition. Fireweed's claim in this case is brought under a different section of the Act, and *Cel-Tech* is therefore irrelevant to the instant case.

Fireweed has alleged in paragraphs 31, 32, 35, and 36[18] that Warner Brothers actions were deceptive. "A practice which is deceptive is necessarily unfair." *Blakemore v. The Superior Court of Los Angeles County*, 129 Cal.App.4th 36, 49 (2005). In *Blakemore*, the Court determined that defendant's practice of shipping unordered products and refusing to grant credit for returned products constituted a violation of California's Act because the practice deceived plaintiffs into paying for unordered products with the expectation their accounts would be credited in the future. *Id.*

Contrary to Warner Brothers' assertions, Warner Brothers' actions are exactly the type of conduct the California Act was intended to prevent. Warner Brothers' practice was to bill Fireweed for Friends and The Drew Carey Show episodes before Warner Brothers

HARTIG RHODES
HOGE &
LEKISCH, P.C.
ATTORNEYS AT LAW
717 K STREET
ANCHORAGE,
ALASKA
99501-3397
TELEPHONE:
(907) 276-1592
FAX:
(907) 277-4352

---

[18] Warner Brothers actions in licensing Friends and/or The Drew Carey Show to TBS and releasing DVDs of the syndicated episodes within Fireweed's market were deceptive because Fireweed did not know of Warner Brothers' plans to undermine the value of their contract.

made those episodes available to Fireweed.  In addition, the value of the contracts lay in the fact that Fireweed aired the episodes exclusively in the Anchorage market.[19]  Warner Brothers destroyed the market value of those episodes by selling DVDs of the syndicated episodes within the Anchorage market and by licensing the episodes to TBS, a cable television system.

## VIII.  ALASKA UNFAIR TRADE PRATICES

Again in support of its position that Fireweed has failed to state a claim under Alaska's Unfair Trade Practices Act, Warner Brothers cites federal district court cases interpreting North Carolina and Louisiana state laws.  Mot. to Dismiss at 35.  These cases are inapposite because they do not address Alaska statutory law.

Fireweed alleges Warner Brothers violated the Alaska Act by its improper billing practices and by selling DVDs of the syndicated *Friends* and/or *The Drew Carey Show* episodes in the Anchorage market.  Counterclaim at ¶¶ 39-40.  These practices are unfair pursuant to AS 45.50.471(4), (11), (12), and (14).

In addition, Warner Brothers' actions violate Alaska's Act under the sole Alaska case relied upon by Warner Brothers is *State v. O'Neill Investigations, Inc.*, 609 P.2d 520 (Alaska 1980). Warner Brothers' quotes from *O'Neill*, 609 P.2d at 535, the factors for determining unfairness:

> (1) whether the practice, without necessarily having been previously considered unlawful, offends public policy as it has been established by statutes, the common law, or otherwise - whether, in other words, it is within at least the penumbra of some common law, statutory, or other established concept of unfairness; (2) whether it is immoral, unethical,

HARTIG RHODES
HOGE &
LEKISCH, P.C.
ATTORNEYS AT LAW
717 K STREET
ANCHORAGE,
ALASKA
99501-3397
TELEPHONE:
(907) 276-1592
FAX:
(907) 277-4352

---

[19] Subject to the WTBS exception for cable customers.

oppressive, or unscrupulous; (3) whether it causes substantial injury to consumers (or competitors or other businessmen).

Mot. to Dismiss at p 34. The *O-Neill* factors are not a barrier to Fireweed's claims.

## IX.     INTERFERENCE WITH PROSPECTIVE ECONOMIC ADVANTAGE (CALIFORNIA)

Warner Brothers lists five elements a plaintiff must demonstrate in order to prevail on a claim for intentional interference with a prospective economic advantage in California. Mot. to Dismiss at p 35. Warner Brothers alleges that Fireweed has failed to satisfy the third element, that intentional acts on the part of the defendant were designed to disrupt the relationship between plaintiff and some third party. *Id.* at 35-6. Warner Brothers is wrong. Fireweed alleges at paragraph 45 of its counterclaim:

> [Warner Brothers] intentionally inserted clauses into its contracts with third party syndicators to limit them from selling syndicated television programming to any party other than [Warner Brothers] and [Warner Brothers] intended such actions to disrupt the relationship between [Fireweed] and third party syndicators.

## X.     INTERFERENCE WITH PROSPECTIVE ECONOMIC ADVANTAGE (ALASKA)

Warner Brothers alleges that Fireweed cannot establish that Warner Brothers engaged in wrongful conduct and so its claim for interference with a prospective economic advantage must fail. Mot. to Dismiss at 37. Fireweed alleged at paragraph 52 of its counterclaim Warner Brothers' wrongful conduct that interfered with Fireweed's prospective contracts with third party syndicators:

> [Warner Brothers'] insertion of a contractual limitation in its contracts with third party syndicators limiting their capacity to sell television programming to any other buyers caused third party syndicators to refuse to contract with [Fireweed] for the sale of television programming during all relevant periods.

HARTIG RHODES
HOGE &
LEKISCH, P.C.
ATTORNEYS AT LAW
717 K STREET
ANCHORAGE,
ALASKA
99501-3397
TELEPHONE:
(907) 276-1592
FAX:
(907) 277-4352

## CONCLUSION

The Federal Rules of Civil Procedure provide very liberal standards for alleging claims.

Fireweed has met those standards. Warner Brothers' Motion to Dismiss should be denied.

DATED at Anchorage, Alaska this 12th day of July, 2006.

By:　/s/ Michael Jungreis
717 K Street
Anchorage, AK 99501
(907) 276-1592 telephone
(907) 277-4352 facsimile
Michael.jungreis@hartig.com
Alaska Bar No. 7711184

By:　/s/ Bethany Pribila
Bethany Pribila
Alaska Bar No. 0405033
bap@hartig.com

**CERTIFICATE OF SERVICE**

The undersigned hereby certifies a true
and exact copy of the foregoing was served
on the below-identified attorney
of record via e-filing on this 12th day of July, 2006:

Eric J. Jenkins
Davis Wright Tremaine LLP
701 W. 8th Avenue, Suite 800
Anchorage, AK  99501

　/s/Bethany Pribila
Hartig Rhodes Hoge & Lekisch,P.C.

F:\Docs\100591\PLEADINGS\Opp to Mot to Dismiss FILED COPY.doc

**HARTIG RHODES HOGE & LEKISCH, P.C.**
ATTORNEYS AT LAW
717 K STREET
ANCHORAGE, ALASKA
99501-3397
TELEPHONE:
(907) 276-1592
FAX:
(907) 277-4352