IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF ALASKA

WARNER BROS. DOMESTIC
TELEVISION DISTRIBUTION,
a division of WARNER BROS.
TELEVISION DISTRIBUTION INC., a
Delaware corporation,

                Plaintiff,

     vs.

FIREWEED COMMUNICATIONS
CORPORATION, an Alaska
corporation,

             Defendant.

Case No. 3:06-cv-00074   TMB

O R D E R

## I.  MOTION PRESENTED

Plaintiff Warner Bros. Domestic Television Distribution ("WBDTD"), a division of

Warner Bros. Television Distribution, Inc., has sued defendant Fireweed Communications

Corporation ("Fireweed") for breach of contract.  Fireweed has counterclaimed for (1) violations

of the Sherman Antitrust Act, 15 U.S.C. § 1, and the Clayton Act, 15 U.S.C. § 14, (2) violation

of California Antitrust laws**,** Cal. Bus. & Prof. Code §§ 16720, 16726, 16767**,** (3) violation of

Alaska Antitrust laws, AS 45.50.566, (4) breach of contract, (5) violation of the California Unfair

Practices Act, Cal. Bus. & Prof. Code § 17000 *et seq.*, (6) violation of Alaska Unfair Trade

Practices Act, AS 45.50.471 *et seq.*, and (7) interference with prospective economic advantage

under both California and Alaska law.  WBDTD moves to dismiss all of Fireweed's

counterclaims.  The Court has reviewed counsels' submissions and considered their arguments.

For the reasons set forth below, the Court GRANTS the Motion in part and DENIES the Motion in part.

## II.  BACKGROUND

In May 2000, Fireweed entered into agreements with Time Warner Entertainment Company, L.P. ("Time Warner") regarding two television series, The Drew Carey Show and Friends.  According to WBDTD's original complaint, WBDTD is a division of Time Warner. The parties disagree over the exact nature of these agreements, as Fireweed is now claiming they are unenforceable for various reasons.  However, Fireweed agrees that the following characterization by WBDTD is a "vague description" of the Drew Carey agreement: "On or about May 25, 2000, Defendant entered into a Syndication License Agreement with Plaintiff whereby Defendant was granted a license to broadcast on Defendant's station all episodes of the television series 'Drew Carey' produced for network television (the 'Drew Carey Agreement.')" Fireweed also agrees that WBDTD's characterization of the Friends agreement, which is the same as the Drew Carey agreement, is a "vague description" of that agreement.

In May 2002, Fireweed entered into a second agreement with Time Warner regarding the television series Friends.  Again, the parties disagree as to the exact nature of this agreement, but Fireweed concedes that the following is a "vague description:" "On or about May 20, 2002, Defendant entered into a Syndication License Agreement with Plaintiff whereby Defendant was granted a license to broadcast on Defendant's station all episodes of the television series 'Friends' (2nd Cycle) for six consecutive years, plus two extended terms of 39 weeks each, following the end of the first syndication cycle of the series (the 'Friends 2nd Cycle Agreement' . . . )."

2

Fireweed alleges that WBDTD illegally tied the Drew Carey and Friends agreements together, and would not allow Fireweed to broadcast Friends unless Fireweed also bought the rights to broadcast Drew Carey.  According to Fireweed, the agreements violate federal antitrust law as well as California and Alaska antitrust law.

In addition, Fireweed alleges that WBDTD, in arranging for television programming for its "WB 100+ Network," prevented third party syndicators from selling any of their programs to any broadcast stations in markets smaller than the top 100 television markets in America by inserting exclusivity clauses into their contracts.  Even though the WB 100+ Network was not available in the Anchorage area until July 2004 and was therefore not competing in the Anchorage market, Fireweed alleges that these third party syndicators were unable to sell their programs to Fireweed or any other television station in Anchorage because of the exclusivity clauses.  Fireweed argues that this arrangement gave WBDTD a monopoly in television programming, in violation of federal and state antitrust law.

Fireweed also argues that, if the agreements were in fact enforceable contracts, WBDTD breached those contracts by allowing another television station to broadcast Friends and Drew Carey, and by allowing DVDs of both shows to be sold in Fireweed's geographic market.

Additionally, Fireweed alleges that in taking all the above mentioned actions, and by billing Fireweed for Friends episodes it had not yet received, WBDTD violated various California and Alaska unfair practice laws and engaged in intentional interference with prospective economic advantage.

# III.  DISCUSSION

In considering a motion to dismiss for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6), "a judge must accept as true all of the factual allegations contained in the complaint."[1]  The Court asks whether plaintiffs have alleged "enough facts to state a claim to relief that is plausible on its face."[2]

Federal Rule of Civil Procedure 8(a)(2) requires every complaint to contain "a short and plain statement of the claim showing that the pleader is entitled to relief."  "Specific facts are not necessary; the statement need only give the defendant fair notice of what the . . . claim is and the grounds upon which it rests."[3]  Nevertheless, "a plaintiff's obligation to provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do."[4]

## 1. Violation of Federal Antitrust laws, 15 USC §§1, 14

### A. Tying Arrangement

A tying arrangement exists where a seller sells one product (the "tying product") on the condition that the buyer also purchase a separate product (the "tied product").  However, not all ties are illegal.  "[T]he essential characteristic of an invalid tying arrangement lies in the seller's exploitation of its control over the tying product to force the buyer into the purchase of a tied

---

[1]     *Erickson v. Pardus*, 127 S. Ct. 2197, 2200 (2007).

[2]     *Bell Atlantic Corp. v. Twombly*, 127 S. Ct. 1955, 1974 (2007).

[3]     *Erickson*, 127 S. Ct. at 2200 (internal quotations omitted).

[4]     *Twombly*, 127 S. Ct. at 1964-65 (citing *Papasan v. Allain*, 478 U.S. 265, 286 (1986) (explaining that on a motion to dismiss, courts "are not bound to accept as true a legal conclusion couched as a factual allegation")).

product that the buyer either did not want at all, or might have preferred to purchase elsewhere on different terms."[5]

There are two standards under which federal courts have analyzed tying arrangements. Where a plaintiff can show that the defendant had sufficient market power in the tying market to make it likely that the defendant could have forced buyers to purchase the tied product, then the "*per se*" standard applies. Under the *per se* analysis, competitive harm in the tied product market is presumed so long as the tie affects a "'not insubstantial' amount of interstate commerce" in the market for the tied product.[6] In contrast, if the plaintiff fails to prove that the defendant has enough market power in the tying product market to make forcing likely, then the "rule of reason" analysis applies. Under the rule of reason, the plaintiff must prove, after a consideration of all economic factors, that the alleged tie actually reduced competition in the market for the tied product.[7]

As discussed below, the Court finds that Fireweed has pled sufficient allegations to meet the *per se* standard.[8] The three elements of a *per se* illegal tying arrangement are: "(1) a tie-in between two products or services sold in different markets, (2) market power in the tying product, and (3) the tying arrangement affects a not insubstantial volume of commerce."[9]

---

[5]    *Jefferson Parish Hosp. Dist. No. 2 v. Hyde,* 466 U.S. 2, 12 (1984).

[6]    *N. Pac. Ry. v. United States*, 356 U.S. 1, 6 (1958) (quoting *Int'l Salt Co. v. United States*, 332 U.S. 392 (1947)).

[7]    *See Bus. Elecs. Corp. v. Sharp Elecs. Corp.*, 485 U.S. 717, 723 (1988).

[8]    Therefore the Court finds that there is no reason to consider the allegations under the rule of reason analysis at this stage.

[9]    *Datagate, Inc. v. Hewlett-Packard Co.,* 60 F.3d 1421, 1423-24 (9th Cir. 1995).

WBDTD claims that Drew Carey and Friends are part of the same market - that of syndicated television programming.  The Supreme Court has considered a number of factors in defining relevant markets, including, price, use and quality.[10]  These three factors help determine whether products are interchangeable, and thus in the same market.[11]  Consideration of these factors indicates that, under the facts as alleged by Fireweed, Friends and The Drew Carey Show occupy distinct markets.  First, WBDTD alleges a significant difference in quality between the two shows.  In addition, it is telling that WBDTD sold the broadcasting rights for Drew Carey for $1500 per week, but sold the rights for Friends for $2500 per week.  From this fact, it appears that WBDTD itself sees a significant difference in quality between the shows.  The Court finds that Fireweed has therefore sufficiently pled that Friends and The Drew Carey Show are in distinct markets.

Even assuming the shows are in different markets, WBDTD places substantial weight on its argument that Fireweed was required to conclusively define the relevant markets at the pleading stage and has failed to do so.  The Court does not agree that Fireweed was required to engage in this type of market definition at this stage.  The Supreme Court has found that market definition is a fact-based inquiry and often requires discovery.[12]

WBDTD nevertheless contends that "Fireweed must define the relevant product market and prove that WBDTD holds power within this market."  While this may be a fair statement of

---

[10]     *United States v. E.I. du Pont de Nemours & Co*., 351 U.S. 377, 404 (1956).

[11]     *Id.*

[12]     *See Eastman Kodak Co. v. Image Technical Servs.,* 504 U.S. 451, 482 (1992); *see also, e.g., Found. for Interior Design Educ. Research v. Savannah Coll. of Art & Design*, 244 F.3d 521, 531 (6th Cir. 2001) (noting that "[m]arket definition is a highly fact-based analysis that generally requires discovery.").

the hurdle that Fireweed will face at summary judgment, Fireweed need not provide specifics

with respect to these facts – and certainly need not "prove" these facts – in order to survive a

motion to dismiss.[13]  In this case, Fireweed has alleged that WBDTD "has been and continues to

be among the world's largest and most well-known distributors of syndicated television

programming for broadcast on television," and that the "Friends series, owned and licensed

exclusively by [WBDTD] possesses sufficient copyright desirability to confer on [WBDTD]

sufficient market power to inflict the undesirable Drew Carey Show on [Fireweed]."  Although it

appears Fireweed may have an uphill battle before it, the Court would not characterize these

allegations as implausible or speculative in nature.  Nor is the Court prepared to find at this early

stage that defining the relevant market and determining market power require so little factual

analysis that the Court can come to conclusions contrary to the allegations set out by Fireweed.

The Court finds that Fireweed has sufficiently pled a tie-in between two products, which it

alleges are in different markets, and it should be allowed discovery to determine the relevant

market.[14]

---

[13]     This Court is not prepared to take the route of the court in *Savannah College*, as suggested by WBDTD, since this Court cannot conclude at this stage that "definition of the relevant market requires relatively little factual analysis."  *Id*.  The Court notes that in *Savannah College*, the court went on to itself define the market contrary to the antitrust plaintiff's allegations "[b]ased on a review of the record."  *Id.*

[14]     Fireweed has alleged that WB conditioned the granting of the license for Friends on Fireweed's agreement to accept the license for The Drew Carey Show.  WBDTD argues that the Court need not accept this allegation as true on the basis that it is inconsistent with the language of the Drew Carey Agreement itself, which states that Fireweed itself proposed this arrangement.  However, Fireweed states that this language was drafted by WB, and argues that it should be allowed to introduce extrinsic evidence to show that WB in fact made the Friends license conditional on accepting the Drew Carey license.  In these circumstances, the Court agrees with Fireweed, and accepts Fireweed's allegations as true for purposes of this motion to dismiss.

WBDTD next argues that according to the recent Supreme Court holding in *Illinois Tool Works*, Fireweed cannot satisfy the second element and successfully allege sufficient market power in Friends to tie Drew Carey. However, *Illinois Tool Works* dealt with a motion for summary judgment, whereas Fireweed here is only facing a motion to dismiss.[15] *Illinois Tool Works* is relevant to this case in that it found that patents and copyrights no longer create a rebuttable presumption of market power.[16] However, the Supreme Court did *not* find that a copyright can never create a monopoly. In addition, market power can be proved in various ways: "the crucial economic power may be inferred from the tying product's desirability to consumers or from uniqueness in its attributes."[17] Also, WBDTD asserts that market power turns on the definition of the relevant market. It is therefore appropriate to proceed to discovery and allow Fireweed to develop expert testimony about the market power and uniqueness of Friends.

Under the *per se* analysis, Fireweed must also allege that "the tying arrangement affects a not insubstantial volume of commerce."[18] Multiple parties or transactions are not required in order to constitute a "not insubstantial volume of commerce." One sale can fulfill the requirement as long as the dollar amount is not insubstantial.[19] In its original complaint WBDTD claimed that $624,000 is the amount in controversy here. The Drew Carey license agreement on its own was worth $195,000 for the initial term of broadcasting, and the Friends agreement was

---

[15]    *Illinois Tool Works Inc. v. Indep. Ink, Inc.*, 126 S. Ct. 1281, 1285 (2006).

[16]    *Id.* at 1291.

[17]    *Didgidyne Corp. v. Data Gen. Corp.,* 734 F.2d 1336, 1340 (9th Cir. 1984).

[18]    *Datagate*, 60 F.3d at 1423-24.

[19]    *Id.* at 1425.

worth $325,000 for its initial term.  It is plain that the amounts we are dealing with here do not constitute an "insubstantial volume of commerce."

*Illinois Tool Works* and the various other cases WBDTD points to show only that Fireweed has its work cut out for it before the summary judgment stage.  As this is a motion to dismiss, Fireweed need only plead "a short and plain statement of the claim showing that the pleader is entitled to relief."[20]  The function of the pleading is to give "the opposing party fair notice of the nature and basis or grounds of the pleader's claims and a general indication of the type of litigation that is involved . . .."[21]  Fireweed has given WBDTD more than a "general indication" of the nature of the case it should prepare to defend.  Therefore, Fireweed has sufficiently pled a tying arrangement in violation of the Sherman Act § 1, and survives WBDTD's motion to dismiss.

### B. Exclusivity Contracts

Distinct from its tying allegations, Fireweed has also alleged that in arranging for television programming for its "WB 100+ Network," WBDTD engaged in an unreasonable restraint of trade by inserting exclusivity clauses into its contracts with third party syndicators, which prevented them from selling any of their programs to any broadcast station in markets smaller than the top 100 television markets in America.  Fireweed further alleges that although the WB 100+ Network was not available in the Anchorage area until July 2004, and was therefore not competing in the Anchorage market, these third party syndicators were unable to

---

[20]     FED. R. CIV. P. 8(a)(2).

[21]     5 CHARLES ALAN WRIGHT & ARTHUR R. MILLER, FEDERAL PRACTICE AND PROCEDURE, §1215 (3d ed. 2004).

sell their programs to Fireweed or any other television station in Anchorage because of the exclusivity clauses.

"To establish a cause of action for unreasonable restraint of trade, the plaintiffs must show the following elements: (1) an agreement among two or more persons or distinct business entities; (2) which is intended to harm or unreasonably restrain competition; and (3) which actually causes injury to competition."[22]

Under the facts as alleged by Fireweed, it seems clear that the contracts between WBDTD and the third party syndicators constitute agreements among two or more distinct business entities. WBDTD argues that, assuming these are the agreements at issue, Fireweed must allege that WBDTD and the syndicators shared "'a conscious commitment to a common scheme designed to achieve an unlawful objective.'"[23] WBDTD contends that Fireweed has failed to state such an allegation.

In *Monsanto Co. v. Spray-Rite Service Corp.*, the Supreme Court determined that the court below had applied an incorrect standard of proof by permitting a price-fixing agreement between a manufacturer and certain distributors to be inferred from the complaints of other distributors who had tried to sell at lower prices.[24] Rather than allowing this type of inference to stand, the Supreme Court found that "something more than evidence of complaints is needed," and that "[t]here must be evidence that tends to exclude the possibility that the manufacturer and

---

[22]    *Murphy v. Business Cards Tomorrow, Inc.*, 854 F.2d 1202, 1205 (9th Cir. 1988) (citing *Reid Brothers Logging Co. v. Ketchikan Pulp Co.*, 699 F.2d 1292, 1296 (9th Cir. 1983)).

[23]    *Monsanto Co. v. Spray-Rite Serv. Corp.*, 465 U.S. 752, 764 (1984) (quoting *Edward J. Sweeney & Sons, Inc. v. Texaco, Inc.*, 637 F.2d 105, 111 (3d Cir. 1980)).

[24]    465 U.S. at 763.

nonterminated distributors were acting independently."[25]  It was in light of this concern that the Court stated that "the antitrust plaintiff should present direct or circumstantial evidence that reasonably tends to prove that the manufacturer and others 'had a conscious commitment to a common scheme designed to achieve an unlawful objective.'"[26]

In this case, taking Fireweed's allegations as true, it is evident that WBDTD and the sydicators were acting together to prevent the syndicators from selling certain programs in certain markets.  No inference is required; the exclusivity clauses in the contracts speak for themselves. The real question is whether these agreements were "designed to achieve an unlawful purpose,"[27] and whether the agreement was "intended to harm or unreasonably restrain competition."[28]

Paragraph 12 of Fireweed's Counterclaims states that "[t]he exclusivity provisions of the contracts between Plaintiff and third party syndicators was an illegal attempt to monopolize . . .." The Court finds that Fireweed's allegation that the agreement was an "attempt to monopolize" constitutes an allegation that the agreement was "intended to harm or unreasonably restrain competition."  Although Fireweed does not provide any additional factual allegations regarding the alleged intent to restrain competition, specifics of this kind regarding intent tend to require discovery and are often unavailable to parties at the pleading stage.  The Court therefore finds Fireweed's allegations sufficient to meet the second requirement for an unreasonable restraint of trade claim.

---

[25]     *Id.* at 764.

[26]     *Id.* (quoting *Edward J. Sweeney & Sons*, 637 F.2d at 111).

[27]     *Id.*

[28]     *Murphy*, 854 F.2d at 1205.

Finally, Fireweed must have alleged that the exclusivity provisions "actually cause[d] injury to competition."[29]  WBDTD argues that Fireweed's antitrust counterclaims should be dismissed "because the alleged facts are incapable of showing actual harm to competition in a properly defined market."  Specifically, WBDTD argues that "[t]o show the alleged exclusivity provision had the requisite effect, Fireweed must define the relevant geographic and product markets, and demonstrate the provision's anticompetitive effects within those markets."[30]  For this proposition, WBDTD cites to *Metro Industries, Inc. v. Sammi Corp.*,[31] in which the Ninth Circuit stated that the plaintiff must establish "injury to competition, beyond the impact on the claimant, within a field of commerce in which the claimant is engaged."  This statement was, however, made in the summary judgment context, and this showing is not required in the pleadings.  In *Metro Industries, Inc.*, the Court found that:

> By alleging in its complaint that because of Sammi's manipulation of the registration system "existing and potential competition in the relevant markets has been unreasonably restrained and substantially lessened, independent United States importer-distributors have been severely damaged or eliminated from the markets, concentration has been increased in those markets, and a tendency towards monopoly has been created," Metro has made the minimal allegations about the impact on competition in the United States necessary to state a claim for a Sherman Act violation.[32]

These allegations, which the court found adequate, are not dissimilar in form and degree of detail to the allegations made by Fireweed.  Fireweed has alleged that the exclusivity clauses "prevented third party syndicators from selling any of their syndicated television programming to

---

[29]     *Id*.

[30]     *Id.*

[31]     82 F.3d 839, 847 (9th Cir. 1996) (internal quotes omitted).

[32]     *Id.*

broadcast stations in the markets smaller than the top 100 television markets," and that this restraint of trade "harmed defendant as well as its consumers, the Anchorage viewing public." Fireweed claims that in part because of these agreements it suffered damages "in losing otherwise available programming that would have enhanced its advertising revenue, its value as a station, its ratings in the Anchorage television stations market, and its viewership; and in paying more than it otherwise would have to Plaintiff for syndicated programming." While these particular harms are described specifically with respect to Fireweed and its viewers, the Court finds that the allegations as a whole indicate that such harm is alleged with respect to all similarly situated broadcast stations in markets outside of the top 100 television markets in America. This fact distinguishes Fireweed's allegations from cases cited by WBDTD, in which allegations were found to be insufficient where the only injury pled was injury to the antitrust plaintiff itself, and not to competition generally.[33]

Contrary to WBDTD's assertions – and as discussed above in the Court's consideration of Fireweed's tying claims – Fireweed was not required to explicitly define the relevant markets and provide its evidence regarding the anticompetitive effects at the pleadings stage. Having reviewed Fireweed's counterclaims, the Court concludes that Fireweed has alleged enough facts

---

[33]     *See, e.g., Rutman Wine Co. v. E. & J. Gallo Winery*, 829 F.2d 729, 734-35 (9th Cir. 1987).

13

to state a claim to relief that is plausible on its face.[34]   Therefore, WBDTD's motion to dismiss must be denied with respect to Fireweed's federal antitrust claims.

## 2. Violation of California Antitrust laws, Cal. Bus. & Prof. Code §§ 16720, 16726 and/or 16767[35]

The parties agree that Fireweed's claims under California antitrust law are subject to the same analysis applied under federal law.  Having found that Fireweed has sufficiently pled its federal antitrust claims, the Court also finds that Fireweed's California antitrust claims survive 12(b)(6) dismissal.

## 3. Violation of Alaska Antitrust laws, AS 45.50.566

Fireweed has also asserted that WBDTD's alleged illegal tying of the Drew Carey Show to its Friends program violated Alaska antitrust laws, specifically AS 45.50.566.  While WBDTD states that Alaska courts use cases construing the federal antitrust statutes in deciding claims under Alaska antitrust law, WBDTD nevertheless argues that it is unclear that AS 45.50.566

---

[34]    In a footnote, WBDTD also argues that Fireweed's claims under Section 3 of the Clayton Act should be dismissed for the additional reason that Section 3 only applies to "goods, wares, merchandise, supplies or other commodities," and not to intangible items like licenses for syndicated programming.  *See Tele Atlas N.V. v. Navteq Corp.*, 397 F. Supp. 2d 1184, 1192-93 (N.D. Cal. 2005) (tying allegation relating to a patent licence does not fall within Section 3 because a patent license is not a tangible good).  WBDTD's argument is well taken.  However, without more information, the Court is not prepared at this time to determine that the tying and tied products at issue are intangible.  If, for instance, the episodes are sent to Fireweed on physical discs, the Court may be required to apply the "dominant nature test" to determine whether the combined disc and license constitute a commodity within the meaning of Section 3 of the Clayton Act.  *See, e.g., Ansel Commc's, Inc. v. Novell, Inc.*, 1999 WL 33302368 at *2 (N.D. Cal. 1999).  The Court will therefore reserve decision on this issue.

[35]    The Court notes that neither party briefed the choice of law issues raised by a number of Fireweed's counterclaims.  Without the benefit of briefing by the parties, and since "courts need not address choice of law questions *sua sponte*," the Court will not address these issues at this time.  *In re Korean Air Lines Disaster of Sept. 1, 1983*, 932 F.2d 1475, 1495 (D.C. Cir. 1991).

reaches tying arrangements.  Neither party cites to a case in which AS 45.50.566 has been

applied to tying arrangements.  However, the Court notes that the language of AS 45.50.566

closely tracks the language of the Clayton Act, 15 U.S.C. §14, whose prohibition of certain tying

arrangements is well established.[36]  Given the parallel language and the Alaska courts' general

reliance on federal antitrust precedent, the Court rejects WBDTD's argument that AS 45.50.566

does not extend to trying arrangements.  Having already found that Fireweed has sufficiently pled

---

[36]        AS 45.50.566 provides:

It is unlawful for a person to lease or make a sale or contract for sale of goods,
wares, merchandise, machinery, supplies, or other commodities, or services, whether
patented or unpatented, for use, consumption, enjoyment, or resale, or fix a price
charged for it, or discount from, or rebate upon, that price, on the condition,
agreement, or understanding that the lessee or purchaser will not use or deal in the
goods, wares, merchandise, machinery, supplies, or other commodity or service of
a competitor or competitors of the lessor or seller, if the effect of the lease, sale, or
contract for sale, or of the condition, agreement, or understanding may be
substantially to lessen competition or tend to create a monopoly in any line of
commerce.

For comparison, 15 U.S.C. §14 provides:

It shall be unlawful for any person engaged in commerce, in the course of
such commerce, to lease or make a sale or contract for sale of goods, wares,
merchandise, machinery, supplies, or other commodities, whether patented or
unpatented, for use, consumption, or resale within the United States or any Territory
thereof or the District of Columbia or any insular possession or other place under the
jurisdiction of the United States, or fix a price charged therefor, or discount from, or
rebate upon, such price, on the condition, agreement, or understanding that the lessee
or purchaser thereof shall not use or deal in the goods, wares, merchandise,
machinery, supplies, or other commodities of a competitor or competitors of the
lessor or seller, where the effect of such lease, sale, or contract for sale or such
condition, agreement, or understanding may be to substantially lessen competition
or tend to create a monopoly in any line of commerce.

*See also Int'l Bus. Machs. Corp. v. United States*, 298 US 131, 134-35 (1936); *Jefferson Parish
Hosp. Dist. No. 2 v. Hyde*, 466 U.S. at 10 n.15 and accompanying text (noting that "[i]n enacting
§ 3 of the Clayton Act, 15 U.S.C. §14, Congress expressed great concern about the
anticompetitive character of tying arrangements").

15

its federal antitrust claims, the Court finds that Fireweed's Alaska antitrust claims survive 12(b)(6) dismissal for the same reasons.

### 4. __Breach of Contract__

Fireweed alleges that WBDTD breached the terms of the parties' Friends Agreement by, among other ways, permitting cablecasts of Friends on TBS in Anchorage in violation of the agreement's exclusivity provision.  WBDTD, however, rejects Fireweed's characterization of the terms of the agreement, and seeks dismissal of the claim for breach of contract.  WBDTD argues that since Fireweed relied on the terms and effect of the Agreement in drafting its counterclaims, this Court "need not accept its description" of the Agreements, "but may look to the agreement[s]" themselves to determine whether the facts alleged by Fireweed amount to a breach of the Agreements.[37]  While the Court agrees with WBDTD that it may look to the agreement itself in considering WBDTD's motion to dismiss, the Court cannot conclude that the terms unambiguously require dismissal of WBDTD's claim.

Under the Friends Agreement exclusivity provision, WBDTD agreed not to license any episode of Friends "[f]or local origination cablecasting by any cable television system" in Anchorage.  Thus, the claim turns, in large part, on whether TBS constitutes "local origination cablecasting," a term which is not defined in the agreement.  WBDTD looks to 47 C.F.R. § 76.5(p), where "origination cablecasting" is defined as "Programing . . . subject to the exclusive control of the cable operator."  Based on this definition, WBDTD contends that since the programming on TBS is not under the exclusive control of the cable operator, GCI, TBS' programming does not constitute "local origination cablecasting" as contemplated in the Friends

---

[37]        *See Broder v. Cablevision Sys. Corp.*, 418 F.3d 187, 196 (2d Cir. 2005).

Agreement.  Moreover, WBDTD argues,  TBS is clearly not "local," since it is a national cable channel that reaches almost 90 million households.

To these arguments, Fireweed responds that there is a legitimate dispute as to the meaning of the terms of the Agreement, and reiterates that it contends that TBS is a local origination cablecast.  In support of this position, WBDTD alleges in its briefing that TBS, as shown in Anchorage on GCI Cable, runs local advertising and runs Friends at the same time as Fireweed ran it, thus directly competing for both advertisers and viewers.  Fireweed contrasts TBS, with WTBS (the Atlanta superstation), which it implicitly agrees is not "local origination cablecasting," because it cannot run any Anchorage local advertising, and did not run Friends at a time convenient to most viewers in Anchorage because its programming is based on the U.S. East Coast time zone.  Fireweed further argues that under both Alaska and California law extrinsic evidence is admissible in order to interpret the terms of a contract.

While WBDTD has presented strong extrinsic evidence for its interpretation of the contract, the Court must, at this stage, accept Fireweed's allegations as true and draw all reasonable inferences in its favor.  The Court finds that it has indeed been presented with two plausible and conflicting interpretations of the contract terms.  Accepting Fireweed's interpretation as correct, the Court rejects WBDTD's argument for dismissal.

**5. Violation of California Unfair Practices Act, Cal. Bus. & Prof. Code § 17000 et seq.**

The fifth count of Fireweed's counterclaims against WBDTD is for violation of the California Unfair Practices Act.[38]  WBDTD's first argument for dismissal of this claim is that California law does not apply to conduct in Alaska.  However, the explicit choice of law

---

[38]        CAL. BUS. & PROF. CODE § 17000 et seq.

provision in the Friends and Drew Carey licencing Agreements state that the "Agreement[s] will be construed and governed . . . by the internal laws of the State of California applicable to contracts entered into therein . . .."

In suits based on diversity, the Court applies choice of law principles of the forum state.[39] Thus, Alaska choice of law principles govern. Alaska will enforce a contractual choice of law provision "unless either (a) the chosen state has no substantial relationship to the parties or the transaction and there is no other reasonable basis for the parties' choice, or (b) application of the law of the chosen state would be contrary to a fundamental policy of a state which has a materially greater interest than the chosen state in the determination of the particular issue . . .."[40]

However, before entering into this analysis, there is an additional question as to whether the choice of law provision at issue is broad enough to cover Fireweed's claim under the California Unfair Practices Act. Other courts have described similar provisions as "narrowly worded," and have noted that they do not explicitly bar tort claims related to the contract, and have concluded that narrow choice of law provisions do not bar non-contractual causes of action under the laws of another state.[41] To date neither party has presented any briefing regarding the application of the choice of law provision or Alaska's choice of law principles. Moreover,

---

[39]     *Day & Zimmerman, Inc. v. Chaloner*, 423 U.S. 3, 4 (1975).

[40]     *Long v. Holland America Line Westours, Inc.*, 26 P.3d 430, 432 (Alaska 2001) (applying RESTATEMENT (SECOND) OF CONFLICTS § 187(2) (1971)).

[41]     *See*, *e.g.*, *Towantic Energy, L.L.C. v. General Elec. Co.*, 2004 WL 1737254 at *5 (N.D. Cal. 2004) (gathering cases).

neither party has addressed the choice of law issues raised by Fireweed's other counterclaims. For these reasons, the Court will not make any decision on the choice of law issues at this time.[42]

Thus, the Court will consider the merits of Fireweed's allegation that WBDTD has violated the California Unfair Practices Act.[43]  In its Answer, Fireweed alleges that WBDTD violated this statute by billing Fireweed for episodes of Friends and The Drew Carey Show before they were made available to Fireweed and by selling DVDs of the shows within Fireweed's market.

Having reviewed Fireweed's Answer and its Opposition to WBDTD's Motion to Dismiss, the Court has been unable to discern what provisions, if any, of the California Unfair Practices Act are alleged to have been violated by WBDTD.  In its Opposition, Fireweed explicitly distinguishes one of the cases cited by WBDTD, *Cal-Tech Communications, Inc. v. Los Angeles Cellular Telephone Company*,[44] on the basis that that case was "brought under a different section of the Act," and is therefore "irrelevant to the instant case."  However, nowhere does Fireweed explain what section of the Act they believe WBDTD has violated.  Moreover, the only other case cited by Fireweed, *Blakemore v. Superior Court*,[45] addresses violations of the

---

[42]     In the context of the pending motion to dismiss, the Court need not make a definitive choice of law ruling that would become law of the case.  *See, e.g., New England Surfaces v. E.I. Du Pont De Nemours and Co.*, 460 F. Supp. 2d 153, 160 (D. Me. 2006).  However, in future motions, the Court expects that the parties will address the choice of law questions raised by Fireweed's counterclaims or otherwise indicate their agreement as to what state law governs the claims at issue.

[43]     Cal. Bus. & Prof. Code § 17000 *et seq*.

[44]     973 P.2d 527 (Cal. 1999).

[45]     129 Cal. App. 4th 36 (Cal. Ct. App. 2005).

California Unfair Competition Law ("UCL"),[46] a statute whose requirements and remedies are distinct from those of California's Unfair Practices Act.

The California Supreme Court has painstakingly distinguished the Unfair Practices Act and the UCL.[47] As explained by the Court, the Unfair Practices Act prohibits certain "specific practices which the legislature has determined constitute unfair trade practices."[48] These specific practices are enumerated in the statute, and include, for example, selling goods under cost for the purpose of injuring competitors.[49] The Act has a narrow, defined scope. Within that scope, however, violations carry heavy consequences, including treble damages and criminal sanctions.[50] In contrast, the UCL "does not proscribe specific practices;" rather "it defines 'unfair competition' to include 'any unlawful, unfair or fraudulent business act or practice.'"[51] Also unlike the severe penalties possible under the Unfair Practices Act, UCL plaintiffs are generally limited to injunctive relief and restitution.[52]

In this case, Fireweed has made a counterclaim under the California Unfair Practices Act, but has not listed any claims under the UCL. However, Fireweed has not identified any specific provisions of the Unfair Practices Act, which it claims have been violated, and the Court has been unable to identify any section of the Act susceptible to violation under the facts alleged by

---

[46]     CAL. BUS. & PROF. CODE § 17200.

[47]     *See Cal-Tech Commc'ns*, 973 P.2d at 539.

[48]     *Id*. (internal quotations omitted).

[49]     *See id.*; CAL. BUS. & PROF. CODE § 17043.

[50]     *See Cal-Tech Commc'ns*, 973 P.2d at 539.

[51]     *Id.* (quoting CAL. BUS. & PROF. CODE § 17200).

[52]     *Id.*

Fireweed.  Therefore, the Court finds that Count V of Fireweed's counterclaims should be DISMISSED WITHOUT PREJUDICE.

## 6. Violation of Alaska Unfair Trade Practices Act, AS 45.50.471 et seq.

In addition to its claims under California law, Fireweed has alleged that WBDTD has violated the Alaska Unfair Trade Practices Act.[53]  The Court again notes that neither party has briefed the choice of law issues relating to this claim.  The Court need not decide the choice of law issue at this juncture, and will reserve decision on the issue.

The Supreme Court of Alaska has held that there are two elements to such a claim: "(1) that the defendant is engaged in trade or commerce; and (2) that in the conduct of trade or commerce, an unfair act or practice has occurred."[54]  Regarding the first element, it is undisputed that WBDTD is engaged in trade or commerce.  As for the second element, Alaska uses a variety of factors to determine unfairness, one of which is "whether [the alleged violation] causes substantial injury to consumers (or competitors or other businessmen)."[55]  Fireweed has alleged that WBDTD's sale of DVDs was unfair, and that Fireweed was substantially injured.  Also, Fireweed's allegations regarding WBDTD's billing practices require further discovery before a court could determine whether they were actually unfair.  For these reasons, it would be inappropriate to grant WBDTD's motion for dismissal regarding this claim at this time.

## 7. Interference with Prospective Economic Advantage (CA)

---

[53]    AS 45.50.471 *et seq.*

[54]    *State of Alaska v. O'Neill Investigations, Inc.,* 609 P.2d 520, 534 (Alaska 1980).

[55]    *Id.* at 535.

Fireweed has alleged that WBDTD has engaged in interference with prospective economic advantage in violation of California law.  Under California law, in order to state a claim for intentional interference with prospective economic advantage, a plaintiff must demonstrate:

> (1) an economic relationship between the plaintiff and some third party, with the probability of future economic benefit to the plaintiff; (2) the defendant's knowledge of the relationship; (3) intentional acts on the part of the defendant designed to disrupt the relationship; (4) actual disruption of the relationship; and (5) economic harm to the plaintiff proximately caused by the acts of the defendant.[56]

WBDTD argues that the California Supreme Court has found that the third element "requires a plaintiff to plead intentional wrongful acts," and that "an act is independently wrongful if it is unlawful, that is, if it proscribed by some constitutional, statutory, regulatory, common law, or other determinable legal standard."[57]  At oral argument, counsel for Fireweed argued that the fact that the California Supreme Court has found that unlawful acts are wrongful does not logically entail that *only* unlawful acts can constitute wrongful acts under the statute.  Having found that Fireweed has sufficiently pled its antitrust claims against WBDTD, the Court need not reach this question at this time.  Given that this allegedly illegal conduct is sufficient to meet the third element, and because Fireweed has pled conduct sufficient to meet the other four elements, its claim should not be dismissed at this time.

---

[56]    *Korea Supply Co. v. Lockheed Martin Corp.*, 63 P.3d 937, 950 (Cal. 2003).

[57]    *Id*. at 950-51, 954.

8. **Interference with Prospective Economic Advantage (AK)**

Fireweed has also alleged that WBDTD has engaged in interference with prospective economic advantage under Alaska law.  The Supreme Court of Alaska has found six elements for a tort of interference with prospective economic advantage:

> (1) the existence of a prospective business relationship between the plaintiff and a third party; (2) knowledge by the defendant of the prospective relationship, and intent to prevent its fruition; (3) conduct by the defendant interfering with the relationship; (4) failure of the prospective relationship to culminate in pecuniary benefit to the plaintiff; (5) causation of the plaintiff's damages by the defendant's conduct; and (6) absence of privilege or justification for the defendant's action.[58]

WBDTD argues that to satisfy the third element under Alaska law, Fireweed must allege that WBDTD's conduct was "wrongful."[59]  WBDTD then contends that, "wrongful" means unlawful" under Alaska law.  As in the context of Fireweed's claim under California law, the Court finds that it need not reach that question at this time, since Fireweed has sufficiently pled allegedly illegal conduct.  The Court also finds that Fireweed's factual allegations meet the other five elements required under Alaska law.  Thus, Fireweed's claim survives the motion to dismiss.

## IV.  CONCLUSION

For the foregoing reasons, WBDTD's Motion to Dismiss Defendant's Counterclaims Docket [8] is GRANTED with respect to Count V of Fireweed's counterclaims, which is hereby DISMISSED WITHOUT PREJUDICE, and DENIED with respect to all other counterclaims.

Dated this 18th day of July 2007.                    /s/ Timothy M. Burgess
                                                        TIMOTHY M. BURGESS
                                                        U.S. DISTRICT COURT

---

[58]      *J & S Servs., Inc. v. Tomter,* 139 P.3d 544, 551 (Alaska 2006) (quoting *Hayes v. A.J. Assocs., Inc.,* 960 P.2d 556, 571 (Alaska 1998)).

[59]      *Ellis v. City of Valdez,* 686 P.2d 700, 707-08 (Alaska 1984).